STATE

v.

Chester R. BRIGGS.

No. 2003–404–C.A.

Supreme Court of Rhode Island.

Dec. 6, 2005.

Jane M. McSoley, Esq., Providence, for Plaintiff.

John F. Cicilline, Esq., for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

The defendant, Chester R. Briggs (defendant), appeals from his conviction of first-degree murder of Patricia Jacques (Jacques). Prior to trial, this Court, on appeal from a pretrial lower court ruling, suppressed a substantial portion of the statements the defendant made to police during an almost thirteen-hour interrogation. *State v. Briggs*, 756 A.2d 731, 739 (R.I.2000). The defendant now puts forward a list of errors of a Brobdingnagian length and asks this Court to vacate the jury conviction and grant him a new trial. For the following reasons, we hold that the trial justice did not commit reversible error and, therefore, we affirm the conviction.

### I

### Facts and Travel

Late Wednesday evening on February 19, 1997, Patricia Jacques was found fatal-

ly shot near the stables adjacent to her Tiverton home. At the crime scene, the police found a handwritten note addressed to "Chester," with defendant's fax number on it, indicating that money belonging to Jacques had not yet been returned. The police soon learned that defendant previously had secreted away assets belonging to the victim to conceal them from her creditors and the Internal Revenue Service. The defendant had been in the process of returning those assets.[1] *Briggs,* 756 A.2d at 733–34.

A more thorough discussion of the initial investigation, the interrogation of defendant, and the search of his New Hampshire home—as well as other properties owned by defendant in New Hampshire—can be found in *Briggs,* 756 A.2d at 732–35. For purposes of this appeal, we reiterate that our earlier decision suppressed a portion of defendant's statement made while in police custody, *id.* at 739, but allowed into evidence the contents of a trash bag discarded by Robert Courtemanche, a tenant of defendant, in a communal dumpster on defendant's tenement property, *id.* at 743–44. Before tackling the multitude of legal issues raised on appeal, we will highlight the most important evidence presented at trial.

Despite defendant's repeated assertions that he had finished repaying Jacques just prior to her murder, the state sought to prove that the financial scheme between defendant and Jacques gave defendant motive to commit the crime charged. As noted in *Briggs,* 756 A.2d at 733, the police found a handwritten note addressed to defendant at the crime scene "concerning the return of money belonging to the victim."

The testimony of Sandra Paiement (Paiement) further corroborated the state's theory of the case. At defendant's request, Paiement contacted Jacques by phone and gave her a number that Jacques would need to receive a package. Jacques, who sounded upset during the phone call, told Paiement that she had been trying to reach defendant and was worried about defendant's health. Concerned about Jacques's tone during the phone call, Paiement then gave Jacques her personal telephone number in case Jacques needed to speak to her. Jacques called Paiement a couple of days later and said she was upset because she had not yet received the package. Paiement testified that Jacques sounded as if "she wasn't taking a breath" and that she tried to calm Jacques. That was the last time Paiement spoke to Jacques.

The testimony of Alan Shepard (Shepard) placed defendant in Tiverton on the night of the murder. Shepard, who worked at the Tiverton Getty on Main Road in Tiverton, testified that defendant bought gas from him on the evening of Wednesday, February 19, 1997. According to Shepard, he remembered defendant because he was his last customer of the evening. The defendant drove an early 1990s blue pickup truck with a New Hampshire registration. Shepard testified that, while pumping gas for defendant, he looked at his face for "a few seconds" and saw a white man in his mid-forties.

Shepard's testimony was consistent with that of Francis Jerome (Jerome). Jerome testified that he heard gunshots fired at approximately 9 p.m. on the evening of the murder and then watched a small pickup truck drive around on the Jacques' property.

---

1. The relationship between defendant and Jacques originated many years earlier, when one of her children "was placed with [defen-dant] in foster care after becoming a ward of the State of New Hampshire." *State v. Briggs,* 756 A.2d 731, 734 (R.I.2000).

The state demonstrated that defendant had access to a handgun through the testimony of Robert White (White), the boyfriend of a tenant of defendant. White testified that he bought from William Lyonnais (Lyonnais), a friend of White's family,[2] "a chrome automatic" handgun, which he described as "bigger than a .22" but "smaller than a 9 millimeter," and delivered that gun to defendant. The defendant told White not to tell anyone about the gun. Robert A. Hathaway (Hathaway) of the Rhode Island State Crime Laboratory concluded from the shell casings and projectiles found at the crime scene that the murder weapon was a .38–caliber handgun, which was consistent with White's description of the gun he sold to defendant.

Finally, Timothy Ayers (Ayers), an inmate at the Adult Correctional Institutions (ACI), testified that defendant told Ayers, in significant detail, that he murdered Jacques. According to Ayers, defendant said he owed Jacques approximately $110,000 and that he "had to kill her because [defendant] didn't have her money and she wanted it." Ayers also testified to many details of the murder, such as how many shots were fired, where on the property the murder took place, and the fact that defendant stopped to get gas after murdering Jacques.

While the jury deliberated, the trial justice denied defendant's renewed motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. The jury then found defendant guilty of first-degree murder of Patricia Jacques. The trial justice imposed the statutory life sentence on defendant.

After the conviction, defendant filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure based on newly discovered evidence and alleged discovery violations. This new evidence pertained to Ayers, the jailhouse informant who testified against defendant at trial. After the jury rendered its verdict in this case, Ayers admitted to an investigator for the Public Defender that he had given a statement to authorities concerning a separate criminal case that he now knew to be false. The defendant first argued that Ayers's recantation of his earlier statement in that case amounted to newly discovered evidence that warranted a new trial. The defendant argued further that the state's failure to hand over information that defendant requested concerning Ayers's involvement in that criminal case, as well as the state's failure to disclose three of Ayers's prior convictions, constituted discovery violations. The trial justice denied the motion on all counts.

The defendant now appeals. The analysis portion of this opinion has been divided for purposes of simplicity into issues related to the confrontation clause, evidentiary issues, and miscellaneous issues.

## II

### Confrontation Clause Issues

■■■ The defendant frames several of his claims of error as unconstitutional limitations on his right to cross-examine various witnesses. The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution unquestionably grant a criminal defendant the right to cross-examine witnesses who testify against him at trial. *E.g., State v. Oliveira,* 774 A.2d 893, 921 (R.I.

---

**2.** White did testify at trial that he had lied to protect Lyonnais while testifying in an earlier proceeding about who had sold him the gun.

2001). That right is the primary means by which a criminal defendant may challenge the veracity of a witness's testimony. *Id.* This right, however, is far from absolute; a defendant has only " 'reasonable latitude' to inquire into the bias, motive or prejudice on the part of a witness." *State v. Werner,* 831 A.2d 183, 209 (R.I.2003) (quoting *State v. Hazard,* 745 A.2d 748, 756 (R.I.2000)). A trial justice may foreclose a "proposed line of questioning if it is not relevant to the trial issue, or if the proposed questioning, even if relevant, is outweighed by any of the reasons prescribed in Rule 403 of the Rhode Island Rules of Evidence." *State v. Oliveira,* 730 A.2d 20, 24 (R.I.1999). "[A] trial justice is given wide discretion to permit or limit counsel's cross-examination of witnesses during trial, and that discretion, absent a showing of clear abuse, will not be disturbed on appeal, and then, only if such abuse constitutes prejudicial error." *Id.*

### A

### Sgt. Elwood Johnson

The defendant first argues that the trial justice improperly limited his cross-examination of Sgt. Elwood Johnson (Sgt. Johnson) about the nature of his interrogation of defendant. On direct examination, the state elicited testimony from Sgt. Johnson, over defendant's objection, that he never threatened defendant with "physical harm" during the interrogation. The defendant, on cross-examination, sought to introduce portions of the statement we suppressed in our earlier decision, *Briggs,* 756 A.2d at 739, to prove that Sgt. Johnson's testimony was false. The defendant also voiced objection to the trial justice's warning that if defendant introduced portions of the statement, that would "open[ ] the door" and allow the state to introduce the suppressed statement in its entirety. The trial justice ultimately denied defen-

dant's motion to introduce portions of the suppressed statement.

Prior to trial, we held that defendant's statements after question 1261, on page 186 of the interrogation transcript, were not voluntary and, therefore, inadmissible at trial. *Briggs,* 756 A.2d at 739. The trial justice, based on our holding, confined the inquiries of both defendant and the state to the portion of the statement that we held to be admissible. We decline to hold that the trial justice's strict adherence to our holding constitutes a clear abuse of discretion, especially in light of defendant's efforts to admit only selected portions of the suppressed statement.

Furthermore, we are skeptical about whether defendant would have been able to prove that Sgt. Johnson's testimony lacked veracity. "[A]fter reviewing the record and after carefully listening to the recorded tapes," *id.* at 738, we held that defendant's statements no longer were voluntary at the point "when, in response to a question the defendant informed the officers that *'I'm so tired now, I can't really think,'* and, when the officers thereafter escalated the tone of their questioning and began to ask *increasingly sexually explicit questions* of little or no relevance." *Id.* at 739 (emphases added). The defendant's argument on this point erroneously conflates physical threats with any and all coercive conduct. Put more simply, fatigue and sexually explicit questions are not physical threats. Since Sgt. Johnson's testimony is consistent with our reasons for suppressing the balance of defendant's statement, the trial justice was within her discretion to limit the scope of defendant's cross-examination of Sgt. Johnson to the admissible portions of defendant's statement in accordance with this Court's holding in *Briggs,* 756 A.2d at 739.

■ The defendant next assigns as error the trial justice's refusal to allow him to impeach the testimony of Sergeant Johnson with a previous statement made by the husband of the victim, Cooper Jacques (Cooper). The defendant asked Sgt. Johnson on cross-examination whether he had performed the necessary investigation to corroborate Cooper's statement that he had been watching the television program *Law & Order* on the night of the murder. Sergeant Johnson responded that he had asked fellow officers about the content of the episode that aired the night of the murder, and that their memory of the episode concurred with Cooper's. The defendant attempted to impeach Sgt. Johnson with Cooper's sworn testimony at the bail hearing stating that he could not remember the content of the episode that aired that night. The trial justice sustained the state's objection.

■■ Prior statements may be used to impeach a witness only when they are "sufficiently inconsistent." *State v. Tempest*, 651 A.2d 1198, 1208 (R.I.1995); *see also State v. Morey*, 722 A.2d 1185, 1191 (R.I.1999) (holding that a witness's prior statement was not "sufficiently inconsistent" when he later clarified the discrepancy). The trial justice must determine whether the prior statement is, in fact, inconsistent with the in-court testimony, and we will reverse such a determination only if the decision clearly was wrong. *Tempest*, 651 A.2d at 1208. The trial justice would have been within her discretion in this instance to determine that Sgt. Johnson's testimony, implying that Cooper had at one time remembered the content of the episode, was not at all inconsistent with Cooper's later statement that he no longer could remember that same episode.

The defendant also argues that the trial justice improperly curtailed the cross-examination of Sgt. Johnson as it related to

defendant's theory of the case that the police "had rushed to judgment" in the course of their investigation. The defendant identifies multiple points on which the trial justice sustained objections to defendant's questions, none of which constitutes reversible error. For example, the trial justice foreclosed defendant's right to cross-examine Sgt. Johnson concerning his knowledge of, and involvement with, items that were removed during a search of the home next to defendant's. The trial justice ostensibly did so because Sgt. Johnson had just testified that he was not involved in the search of that home. The trial justice's rulings do not amount to a clear abuse of discretion.

## B

### Dr. James Weiner

■ The defendant next argues that his right to cross-examination was unreasonably curtailed by the trial justice's refusal to allow him to refresh the memory of Dr. James Weiner (Dr. Weiner), a forensic pathologist who testified for the state. Doctor Weiner testified at trial that he did not see any blood on the fingernail clippings of the victim. A report prepared by someone other than Dr. Weiner indicated the possible presence of blood beneath the victim's fingernails. The trial justice refused to allow defendant to refresh Dr. Weiner's recollection with the other report.

■ The only foundational requirement for refreshing a witness's recollection is that the witness clearly must be "unable to remember something of relevance to the matter being litigated." *State v. Presler*, 731 A.2d 699, 704 (R.I.1999). Since the witness did not testify to a lack of memory about whether he saw blood beneath the victim's fingernails, defendant does not meet this modest requirement. A witness's recollection cannot be refreshed

simply because that witness's testimony conflicts with some other written statement. We hold that the trial justice was well within her discretion to limit defendant's cross-examination of Dr. Weiner.

## C
### Lt. Thomas Kaminski

■ The defendant's next assignment of error concerns the cross-examination of Lt. Thomas Kaminski (Lt. Kaminski) of the Tiverton Police Department. The trial justice prevented defendant from inquiring into the names of the twenty-three people whom Lt. Kaminski interviewed during the course of his investigation. The defendant argued before the trial justice, and renews the argument before this Court, that the names of the people interviewed by Lt. Kaminski were relevant to his knowledge and understanding of the case. Lieutenant Kaminski's knowledge of the case, in turn, would give credibility to his interview of Alan Shepard, the gas station attendant and key witness for the state.

As noted previously, a trial justice may limit a line of questioning if it is irrelevant to the proceedings, or if the relevance of the line of questioning is "outweighed by any of the reasons prescribed in Rule 403 of the Rhode Island Rules of Evidence." *Oliveira,* 730 A.2d at 24. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by * * * considerations of *undue delay, waste of time, or needless presentation of cumulative evidence.*" (Emphasis added.) In light of the fact that defendant could inquire about how many people Lt. Kaminski interviewed, the trial justice was well within her discretion to find either: (1) that the individual names of all interviewees were not relevant to proving his knowledge and understanding of the case; or (2) that, even if they were somehow relevant, recit-

ing the name of each interviewee would have been a waste of time that would have unduly delayed a long and complicated trial. We hold that the trial justice did not err in doing so.

## D
### Shepard

■ The defendant next argues that the trial justice committed error during defendant's cross-examination of Shepard, an attendant at a Tiverton gas station who testified that defendant visited his gas station on the night of the murder. In the course of the cross-examination of Shepard, defendant used the witness's previous statements to prove that his memory had been inconsistent about whether the man he saw on the night of the murder was wearing eyeglasses. The defendant continued to press Shepard to explain that inconsistency:

> "Defendant's counsel: But you think you told someone that [the man was wearing eyeglasses] because that's what you just said?
>
> "Shepard: Yes.
>
> "Defendant's counsel: Who do you think you told that to?
>
> "Shepard: Possibly myself.
>
> "Defendant's counsel: Do you talk to yourself a lot?
>
> "Mr. White: Objection.
>
> "The Court: Sustained.
>
> "Defendant's counsel: Well, how many times do you talk to yourself?
>
> "Mr. White: Objection.
>
> "The Court: Sustained."

The defendant claims that the trial justice committed reversible error when she sustained the state's objections.

■ A trial justice may limit the cross-examination of a witness when that cross-

examination "border[s] on harassment." *Hazard*, 745 A.2d at 756; *see also State v. Wiley*, 676 A.2d 321, 324 (R.I.1996) (holding that the "trial justice is afforded this discretionary latitude so that he or she may limit cross-examination on the basis of concerns of witness harassment"). The defendant's final two questions undoubtedly sought to place an exclamation point on a successful challenge of the credibility of Shepard by embarrassing him with his answer that he might have told himself that the person he saw the night of the murder was wearing eyeglasses. The defendant's ability to discredit the witness's identification of defendant was not compromised because he was unable to elicit testimony concerning the frequency with which the witness spoke to himself. That bell had been rung. The trial justice's limitation of defendant's cross-examination was proper.

### E

### White and Lyonnais

The defendant's next argument posits that the trial justice violated his right to confront witnesses White and Lyonnais, the two men who aided defendant in acquiring the murder weapon, concerning whether either witness had received a benefit in exchange for their testimony in this trial.

"[W]e have adopted a per se error rule in reviewing cases in which a trial justice totally precludes cross-examination by defense counsel of the state's key witness on the issues of motive or bias. * * * Total preclusion of this type results in constitutional error irrespective of any attempted justification by the state for the rulings of the trial justice." *State v. Parillo*, 480 A.2d 1349, 1357 (R.I.1984).

"In cases in which 'the restricted line of inquiry would not have weakened the impact of the witness'[s] testimony,' we apply a harmless error analysis." *State v. Hazard*, 797 A.2d 448, 468 (R.I.2002) (quoting *Parillo*, 480 A.2d at 1358 n. 5). The trial transcript, however, demonstrates to us that defendant was not precluded in any way from probing either White or Lyonnais on issues of their respective motives and biases.

Regarding White, defendant claims he was prohibited from asking whether White was charged with perjury for lies made under oath in connection with this case. Although it is true that the trial justice sustained an objection to the question during recross-examination, the trial justice allowed defendant to ask, over objection by the state, two very similar questions during cross-examination: "Now, were you ever charged with perjury?" and "The Rhode Island authorities knew that you committed perjury and you were never charged?" The trial justice's sustaining of an objection to a question on recross-examination, which already had been asked on cross-examination, was proper.[3]

---

3. The trial justice also did not commit reversible error with respect to White's testimony on his other prior convictions. White testified that he had not been convicted of a crime since 1996, when he had, in fact, been convicted of a crime in 1997, and again in 1998. The defendant then was able to impeach White with his criminal record that the state had divulged to defendant in the discovery process. Despite his successful impeach-

ment, defendant argues that the prosecutor violated his duty under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and its progeny, to correct false testimony, and that this failure warrants a new trial. It is true that a prosecutor has a general duty to correct false testimony elicited from a state's witness on cross-examination. *See State v. Towns*, 432 A.2d 688, 691 (R.I.1981). In light of defendant's successful impeach-

The defendant's argument on appeal about Lyonnais is equally unavailing. It is true that the trial justice temporarily prevented defendant from inquiring into possible drug charges pending against Lyonnais in Massachusetts. The trial justice wisely amended her ruling and allowed defendant "some latitude" to show the witness's motive to testify for the state in exchange for a favorable disposition of criminal charges. The trial justice did not limit defendant's subsequent cross-examination of Lyonnais on the status of those drug charges. The trial justice's amended ruling did not limit the defendant's right to cross-examine Lyonnais.[4]

### F

### Cpl. Nicholas Tella

 The defendant next assigns error to the trial justice's refusal to allow him to ask Cpl. Nicholas Tella (Cpl. Tella) during cross-examination about whether he saw twist ties in defendant's pickup truck. This was because Cpl. Tella previously had admitted that he never saw a twist tie in defendant's vehicle. Since the trial justice was well within her discretion to limit this repetitive questioning, *see State v. Ramos*, 574 A.2d 1213, 1216 (R.I.1990), defendant's argument has no merit.

### G

### Jane Wentworth

 The defendant's final argument based on the confrontation clause concerns

his attempt to impeach Jane Wentworth (Wentworth), a tenant of defendant and former girlfriend of White, the man who testified that he sold defendant a handgun. During the cross-examination of Wentworth about when she lived in defendant's building, the trial justice sustained the state's objection to defendant's question about whether she had "another lease" to verify the fact that she moved in a month or two prior to signing her official lease. The defendant now argues he was "completely prevented * * * from using the lease * * * in the questioning of Ms. Wentworth."

The trial transcript does not support defendant's contention. Just prior to the state's objection, defendant succeeded in admitting the lease as a full exhibit. The defendant then elicited from Wentworth that she did not sign the lease until November 23, 1996. Because he was successful in demonstrating that the lease contradicted Wentworth's testimony about when she moved into the apartment, defendant's claim of error is without merit.

### III

### Evidentiary Issues

 The next cluster of arguments presented by defendant concerns various evidentiary rulings by the trial justice. Generally, " '[t]he admissibility of evidence

---

ment of the witness, no prejudice resulted from White's inaccuracy about the dates of his prior convictions. This issue, therefore, presents no basis for reversal.

4. The defendant posits another argument related to the cross-examination of Lyonnais, specifically concerning his testimony on his 1979 conviction for driving a vehicle without the consent of the owner. The defendant argues that the trial justice prevented him from probing Lyonnais on why he would de-

scribe such a conviction as merely "joyriding." Once again, although the trial justice did sustain a preliminary objection to the line of questioning, defendant nonetheless proceeded to impeach the witness with his criminal record, and clarified for the jury that Lyonnais was charged with the greater offense of "taking a vehicle without the owner's consent." Because the record does not support defendant's version of events, this argument is meritless.

is a question addressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a clear abuse of that discretion.' " *State v. Lynch,* 854 A.2d 1022, 1031 (R.I.2004).

## A

### Hearsay Issues

Several of defendant's arguments pertain to the admissibility of hearsay statements, or extra-judicial statements offered to prove the truth of the matter asserted, *see State v. Grayhurst,* 852 A.2d 491, 504 (R.I.2004).

## 1

### Decedent's Declarations

■ The defendant assigns as error the trial justice's admission of out-of-court statements that the victim made to Paiement, a neighbor of defendant. Paiement testified, over defendant's objection, that Jacques told her over the phone that on one occasion Jacques attempted to get in touch with defendant, and, on a separate occasion, that Jacques was concerned about the whereabouts of a package. The defendant argues that the trial justice erred in admitting these statements pursuant to the decedent's declarations exception to the hearsay rule.

The record discloses that the substance of these statements was corroborated by other evidence suggesting that defendant had not finished returning Jacques's assets, including the note found at the crime scene concerning defendant's obligation to return Jacques's money. Therefore, any error in admitting this evidence was harmless beyond a reasonable doubt.

## 2

### Cooper's Statement

■ The defendant next identifies as error his inability to introduce the out-of-court statement by Cooper, the victim's husband, concerning whether Cooper had told the police that he found $5,000 in cash in the Jacques' Tiverton home. In the course of cross-examining Cpl. Tella, the trial justice prevented defendant from asking him what Cooper had told him about the $5,000. The defendant argues on appeal that the trial justice erred in not admitting the statement under Rule 804(b)(5) of the Rhode Island Rules of Evidence because the declarant of the hearsay statement was unavailable.

■ Under Rule 804(b)(5)(B), an out-of-court statement made by an unavailable witness can be admitted to prove the truth of the matter asserted, if, among other requirements, "the statement is more probative on the point for which it is offered than *any other evidence* which the proponent can procure through reasonable efforts." (Emphasis added.) *See also Estate of Sweeney v. Charpentier,* 675 A.2d 824, 827 (R.I.1996). Although it is true that the parties agreed at trial that Cooper was unavailable to testify, defendant already had succeeded in introducing that same evidence during the cross-examination of another witness. Since identical evidence already had been introduced, albeit through an alternate source, the trial justice did not commit reversible error in refusing to admit the statement.

## 3

### Testimony of Bruce Sartwell

■ The defendant next draws our attention to three different occasions in which the trial justice prevented Bruce Sartwell (Sartwell), an investigator hired by defendant, from testifying about what other people told him during the course of his investigation. Earlier in the trial, the testimony of three defense witnesses, Jeanne Zinn (Zinn), John Kalamaras (Ka-

lamaras), and Louellen Pratt (Pratt), placed defendant in New Hampshire on the evening of the murder. On cross-examination of Zinn, Kalamaras, and Pratt, the state sought to discredit each witness's testimony. Later, during Sartwell's testimony, the trial justice sustained the state's three objections to defendant's three separate questions asking Sartwell whether Zinn, Kalamaras, or Pratt had told him that they saw Briggs in New Hampshire on the night of the murder. The defendant contends that those hearsay statements should have been admitted because they qualified as prior consistent statements.

■ Under Rule 801(d)(1)(B) of the Rhode Island Rules of Evidence, a statement is not hearsay if:

"The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive * * *."

We agree with defendant that the state had challenged the credibility of the testimony of Zinn, Kalamaras, and Pratt. The defendant's argument, however, fails to recognize the United States Supreme Court's interpretation of the identical federal rule in *Tome v. United States*, 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), an interpretation that we adopted in *State v. Haslam*, 663 A.2d 902, 908 (R.I.1995). This rule does not accord "weighty, nonhearsay status to all prior consistent statements," and "[p]rior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Tome*, 513 U.S. at 157, 115 S.Ct. 696. Instead, the "recent fabri-

cation" language in Rule 801 creates a temporal requirement: "[T]he consistent statements must have been made before the alleged influence, or motive to fabricate, arose." *Tome*, 513 U.S. at 158, 115 S.Ct. 696; *accord Hazard*, 745 A.2d at 758; *Haslam*, 663 A.2d at 908.

Here, the state sought to discredit the alibi testimony of the three witnesses, necessarily implying that they fabricated the alibi to aid defendant's criminal case. Thus, the trial justice was within her discretion to determine that the motives of Zinn, Kalamaras, and Pratt to aid defendant's criminal case preceded their statements to Sartwell, the man whom defendant hired to investigate the murder on his behalf. Rule 801(d)(1), therefore, did not remove these statements from the definition of inadmissible hearsay.

## B

### Decedent's Telephone Records

■ The defendant argues that the trial justice erred in admitting into evidence Jacques's telephone records, because the state failed to lay the proper foundation for expert testimony. We disagree.

■ The rules governing the trial justice's gatekeeping role in the admission of expert testimony pertain only to "novel, unvalidated scientific or complex technical evidence." *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 685 (R.I.1999). A telephone company's ability to record a list of phone calls made from a phone number is not a new phenomenon. In fact, phone records have been found to be inherently reliable under the business records exception of the hearsay rule. *See United States v. Wills*, 346 F.3d 476, 490 (4th Cir.2003). Thus, the rules governing expert testimony do not apply, and, therefore, defendant's argument is wholly without merit.

## C

### Transcript of Defendant's Police Statement

 The defendant next contends that the transcript of defendant's statement to police was not properly authenticated because, according to him, the transcript was inaccurate. Because the audio tape of defendant's statement to police would be played for the jury, both parties agreed that the transcript of that tape would be provided to the jury to assist the jury in following the tape. The defendant, however, objected to the state's motion to admit the transcript into evidence. ..

 Before evidence is admitted, it must be authenticated with other evidence "sufficient to support a finding that the matter in question is what its proponent claims." R.I. R. Evid. 901(a). "[A]dmission of transcripts into evidence is within the sound discretion of the trial justice." *State v. Ahmadjian*, 438 A.2d 1070, 1082 (R.I.1981). "The trial justice may conduct a hearing before or during trial in which he [or she] reviews the tapes and transcripts. If convinced of their accuracy, he [or she] may then admit the transcripts * * *." *Id.*

In light of defendant's general objection, the trial justice endeavored to satisfy herself that the transcript was, in fact, an accurate written record of the content of the audiotape by carefully reading the transcript while the audiotape was played for the jury. Afterward, she found the transcript to be accurate. The defendant's general assertion to the contrary in his brief, without documenting a single inaccuracy in the transcript, is completely unavailing. Thus, the trial justice did not

commit reversible error when she admitted the transcript into evidence.[5]

## D

### Gunshot Residue

 Next, defendant challenges the trial justice's decision to allow Robert O'Brien (O'Brien), a supervising criminalist in the Connecticut State Police Forensic Science Laboratory, to testify concerning whether he found gunshot residue on defendant's clothes. O'Brien first testified on the standards for assessing gunshot residue. The tested particles can result in one of three findings: (1) positive for gunshot residue, (2) consistent with gunshot residue, or (3) negative for gunshot residue. O'Brien later testified, over defendant's objection, that his test for gunshot residue on defendant's jacket determined that "one or two particles on the left sleeve * * * could be consistent with gunshot residue." Citing numerous cases from other jurisdictions for the proposition that the science of gunshot residue testing is unreliable, defendant argues that O'Brien's testimony should not have been allowed.

 A trial justice is afforded wide discretion in connection with the admission of expert testimony. *State v. Griffin*, 691 A.2d 556, 558 (R.I.1997). This Court has held previously that the admission of expert testimony on the issue of gunshot residue did not amount to an abuse of discretion. *State v. Gomes*, 764 A.2d 125, 135 (R.I.2001). Furthermore, we disagree with defendant that the witness's use of the word "could" in his answer necessarily implies that his testimony was improper. We require experts to testify with a "reasonable" degree of certainty. *State v. Lima*, 546 A.2d 770, 773 (R.I.1988). Our

---

**5.** The defendant's brief does not include a challenge to the trial justice's instruction to the jury on the accuracy of the transcript. *See State v. Ahmadjian*, 438 A.2d 1070, 1082–83 (R.I.1981). Thus, for the purposes of this appeal, that argument is waived.

examination of O'Brien's testimony reveals that he used the word "could" to contrast other portions of his testimony in which he concluded with a reasonable degree of scientific certainty that particles on an article of clothing were "positively identified as gunshot residue." Since the trial justice would have been well within her discretion to make a similar determination regarding this expert witness, she did not commit reversible error on this issue.

**E**

**Testimony of Patricia MacLeod**

The defendant's next argument on appeal is that the trial justice improperly prevented defendant from calling a witness to refute the testimony of Ayers, the jailhouse informant. Ayers testified that he had volunteered at the Meeting Street School in East Providence. The defendant sought to impeach this testimony by calling Patricia MacLeod (MacLeod), an employee of the Meeting Street School, to testify that Ayers was, in fact, not a volunteer. The trial justice sustained the state's motion to exclude MacLeod because she would be testifying to collateral matters.

Rule 608(b) of the Rhode Island Rules of Evidence provides, in relevant part, that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness'[s] credibility * * * may not be proved by extrinsic evidence." Instead, these specific instances "may * * * be inquired into on cross-examination of the witness." *Id.* We have interpreted this rule to prevent a party from impeaching a witness " 'on collateral matters by the introduction of extrinsic evidence.' " *State v. Tutt*, 622 A.2d 459,

462 (R.I.1993); *see also State v. Martinez*, 824 A.2d 443, 449 (R.I.2003) (explaining " '[t]he only bright-line test of collateralness is whether the fact could have been shown in evidence *"for any purpose independently of the contradiction"* ' "). Therefore, should a party elect to inquire into specific instances of the conduct of a witness on cross-examination, then " 'the cross-examiner is restricted to the answers of the witness' " and cannot introduce extrinsic evidence for impeachment purposes. *Tutt*, 622 A.2d at 462.

The trial justice properly applied the law in this instance. MacLeod's testimony would have been extrinsic evidence offered to attack Ayers's credibility by impeaching him on the issue of whether he volunteered at the Meeting Street School. The trial justice did not err in preventing this witness from taking the stand.[6]

**IV**

**Miscellaneous issues**

**A**

**Juror Misconduct**

The next legal issue raised by defendant concerns the trial justice's dismissal of a juror during the course of the trial. The trial justice learned that the wife of a juror had been attending the trial and had been seen conversing with Orr, Jacques's daughter. Outside the presence of the other jurors, defendant, the state, and the trial justice all questioned the juror, who acknowledged that he had in fact been discussing the trial with his wife. Over defendant's objection, the trial justice dismissed the juror. The defendant's argument posits that the juror's communication with his wife did not warrant dismissal

6. We respectfully decline defendant's invitation to alter the law in this area because of Ayers's "stature" as a witness in this case.

because the juror maintained that he and his wife did not discuss the credibility of various witnesses, his wife did not remind him of anything he might have missed, and neither he nor his wife had reached any conclusions.

▬ Rule 24(c) of the Superior Court Rules of Criminal Procedure provides that, after the trial begins, a juror may be dismissed only "for cause." The determination of what constitutes cause in a given case rests within the sound discretion of the trial justice. *State v. Hazard*, 785 A.2d 1111, 1122 (R.I.2001). Here, the juror in question violated the trial justice's clear order that he not discuss the case with anyone outside the jury room. In light of the fact that the juror's wife actually had been attending the trial and that she even went as far as having a conversation with Orr, the daughter of the victim and a witness for the state, the trial justice, acting with an abundance of caution, was well within her discretion to disbelieve the juror's contentions that his conversations with his wife were entirely benign. We hold that cause existed to support the trial justice's dismissal of that juror.

## B

### Alleged Discovery Violations

▬ In his brief, defendant documents numerous instances related to the state's handing over of evidence and contends that each one amounts to a violation of his right to pretrial discovery. Although defendant formally frames this issue as a violation of Rule 16 of the Superior Court Rules of Criminal Procedure, he also discusses interchangeably due process violations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

and its progeny. While Rule 16 and the *Brady* doctrine admittedly are interrelated, they require distinct lines of inquiry.[7] *See State v. Chalk*, 816 A.2d 413, 418 (R.I. 2002). As such, we will set out the law governing both legal doctrines below, and then analyze each with respect to defendant's meritorious allegations of discovery violations.

▬ The overarching purpose of Rule 16 is "to ensure that criminal trials are fundamentally fair." *State v. Gordon*, 880 A.2d 825, 832 (R.I.2005). When a criminal defendant requests discovery material concerning witnesses the state may call to testify at trial, Rule 16 obligates the state to produce "only prior recorded statements of a witness, a summary of the witness's expected trial testimony, and any records of prior convictions." *Chalk*, 816 A.2d at 418.

> "When evidence does not fit one of these three categories, but may nonetheless be helpful to defendant's effective cross-examination of a witness, a defendant's right to that evidence arises from the right of confrontation, and thus becomes an issue 'only when a defendant is improperly denied the ability to confront and to effectively cross-examine an adverse witness at trial.' " *Id.* (quoting *State v. Kelly*, 554 A.2d 632, 635 (R.I. 1989)).

This rule, however, does not require "the disclosure of 'any and all information that might be useful in contradicting unfavorable testimony.' " *Kelly*, 554 A.2d at 635 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)).

▬ Beyond the mandates of Rule 16, the due process clause of the federal

---

7. The standards applied under Rule 16 of the Superior Court Rules of Criminal Procedure and the *Brady* doctrine are the same only

when analyzing "deliberate discovery violations." *State v. Wyche*, 518 A.2d 907, 911 (R.I.1986).

constitution, as interpreted by *Brady* and its progeny, require the state to turn over certain information. Regardless of whether a defendant requests the information, "the suppression by the prosecution of evidence favorable to the accused * * * violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Cronan ex rel. State v. Cronan,* 774 A.2d 866, 880 (R.I.2001) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. 1194). Material evidence, either in the nature of exculpatory or impeachment evidence,[8] must be sufficiently central to the criminal case; there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

 Absent a showing of materiality, we nonetheless will grant a new trial upon a showing that the prosecution's suppression was deliberate. *State v. Wyche,* 518 A.2d 907, 910 (R.I.1986). "The prosecution acts deliberately when it makes 'a considered decision to suppress * * *' or where it fails 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.'" *Id.* (quoting *United States v. Keogh,* 391 F.2d 138, 146–47 (2nd Cir.1968)).

 When we review a determination of whether a violation of Rule 16 or *Brady* occurred, the applicable standard is narrow: the trial justice must have committed clear error. *State v. Rice,* 755 A.2d 137, 151 (R.I.2000). Here the trial justice clearly stated that she had found no evidence of any discovery violations, despite defendant's repeated assertions to the contrary. Furthermore, in her written decision on defendant's posttrial motion for new trial, she expressly ruled that the alleged discovery violations with respect to Ayers did not constitute discovery violations.

1

## Lyonnais's Criminal History

 The defendant's first allegation of a discovery violation stems from the state's failure to make defendant aware of criminal charges then pending against Lyonnais, the man who helped supply defendant with a handgun. Although Lyonnais had told police that in 1998 he had marijuana charges pending against him in Massachusetts, the state, in an effort to comply with defendant's request for discovery, only divulged the results of a search of the National Crime Information Computer Index, which documented other arrests and convictions, but not the Massachusetts charges. The defendant, however, was made aware of the pending charges prior to Lyonnais's testimony. At trial, Lyonnais testified that those charges were pending and that he did not receive favorable treatment in exchange for his testimony in this case.

Although defendant should have had notice prior to trial that Lyonnais, a key state's witness, might have had criminal charges pending against him in Massachusetts, little prejudice resulted from the state's failure in this instance. Put simply, defendant was able to use the Massachusetts charges on cross-examination; defen-

---

8. Although impeachment evidence may be found to be material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), our subsequent cases have held that a due process violation does not occur when the state fails to divulge impeachment evidence that is merely cumulative. *See State v. Chalk,* 816 A.2d 413, 418 (R.I.2002); *State v. Bassett,* 447 A.2d 371, 377 (R.I.1982).

dant inquired on cross-examination whether those charges had been dropped by the Massachusetts authorities in exchange for his testimony in this trial. Lyonnais denied this suggestion and, thus, we fail to see how defendant was prejudiced. Furthermore, if defendant were given a new trial, his cross-examination of Lyonnais on this issue probably would be identical to the one conducted at this trial. Thus, we hold that the state's failure to provide defendant with pending charges did not violate Rule 16 or *Brady.*

## 2

### Twist Ties

■ Because of the state's failure to seize and inventory a twist tie seen in the interior of defendant's pickup truck, defendant argues that the state violated its discovery obligations with respect to the testimony of two different witnesses: Sergeant William Magee (Magee) and Officer Michael Gridley (Gridley). At trial, the state sought to link defendant to the crime scene by proving that twist ties were found both at the crime scene and in defendant's pickup truck. Both Magee, the officer who searched defendant's vehicle, and Gridley, the policeman who took the photographs of the interior of the vehicle, testified to their respective roles in the search of defendant's car. In his argument, defendant acknowledges the fact that a twist tie was not seized from the pickup truck. Furthermore, he admits that the state produced to him a photograph of the interior of his vehicle, the same photograph that the state used to prove that a twist tie was in defendant's pickup truck when the police searched it. The defendant nonetheless argues that the fact that he was unaware that the state had evidence to connect him to the crime scene constitutes a discovery violation.

■ We disagree with defendant on this point because the state handed over the very evidence that it used to prove the existence of the twist tie: the photograph of the interior of defendant's vehicle. The defendant nonetheless argues that he should have been notified expressly about the twist tie in the vehicle. The state is not required to provide defendant with a detailed narration of the testimony of a witness. *State v. Pona,* 810 A.2d 245, 249–50 (R.I.2002).[9] We also have stated that defendant's failure "to use the provided discovery for investigatory purposes should not lead to a dismissal of the case."

---

9. The state's duty with respect to witness testimony is:

> "[T]o provide a defendant with all the relevant, recorded data about the testimony of its witnesses. * * * When the state does not possess such information, it is required to supply the defense with a summary of the witness's expected testimony. * * * The fact that a witness statement is not as thorough as defendant desires does not create a discovery violation." *State v. Pona,* 810 A.2d 245, 250 (R.I.2002).

Although we have concluded that the state technically complied with the above duty, we think the better practice, in light of the state's intention to link defendant to the crime scene through the twist tie evidence, would have been to include a specific reference to the picture of the twist tie in the summary of the expected testimony of the witnesses. State prosecutors, much like their federal counterparts, always should seek to attain the highest professional standards:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

*State v. Beaumier,* 480 A.2d 1367, 1371 (R.I.1984), *overruled on other grounds by State v. Rios,* 702 A.2d 889, 889 (R.I.1997). Minimal investigation was required by defendant in this instance. First, defendant was aware that twist ties were discovered at the crime scene. Second, despite defendant's factual assertions to the contrary, our review of the photograph that was provided to defendant in the discovery process clearly reveals a single black twist tie on the blue driver's seat of defendant's pickup truck. Finally, the state's failure to seize the item from the vehicle only compromised its own case and did not prevent the state from using the photograph to attempt to prove that a twist tie similar to ones found at the crime scene was found in defendant's pickup truck.[10] Accordingly, the twist tie evidence does not amount to a violation of *Brady* or Rule 16 because defendant was not deprived of any evidence.

3

### Ayers's Convictions

 The next alleged error centers on the state's failure, in the process of giving defendant the results of Ayers's criminal history checks in Rhode Island, Massachusetts, and the National Criminal Information Center databases, to disclose three more of Ayers's convictions.[11] The criminal background check, conducted by the state and disclosed to defendant, docu-

mented thirty-four contacts between Ayers and law enforcement.

 Applying the law of Rule 16, the trial justice found in her written decision that while the state failed to disclose the three additional convictions, the extent of prejudice to defendant was so minimal that a new trial was not warranted. Although that determination is subject to our review, "[w]ithout question, the trial justice is in the best position to determine whether any harm has resulted from noncompliance with discovery motions and whether the harm can be mitigated; therefore, his [or her] ruling should not be overturned absent a clear abuse of discretion." *State v. Coelho,* 454 A.2d 241, 244–45 (R.I.1982).

We are in complete agreement with the trial justice's finding that if the high number of Ayers's criminal convictions was insufficient to convince a jury that it should disbelieve his testimony, then three additional convictions would not have changed the minds of the jurors. Put differently, this impeachment evidence is merely cumulative. We hold that the state's failure to disclose three of Ayers's criminal convictions in violation of Rule 16 does not constitute reversible error in this instance.

This failure similarly does not constitute a violation of *Brady.* Although defendant could have impeached Ayers's credibility further with the additional convictions, the fact that defendant did, in fact, impeach Ayers with the numerous convictions that

---

**10.** The defendant argues in his brief that because he was surprised by the use of the picture, the spirit of the discovery rules had been violated. At oral argument, however, defendant could not explain his failure to request a continuance, which, if granted, would have allowed him additional time to prepare his cross-examination in light of the picture.

**11.** The arguments with respect to Ayers originally were raised in conjunction with defendant's posttrial motion for new trial based on newly discovered evidence. On appeal, defendant again addresses these two allegations in conjunction with his argument on the issue of newly discovered evidence. For the sake of simplicity, we will address all the allegations of discovery violations at once, and then address the issue of newly discovered evidence.

were disclosed only warrants the conclusion that the additional convictions would not have resulted in defendant's acquittal. Thus, the trial justice properly concluded that they were not material under *Brady*.

### 4

### Ayers's Statement

■ The defendant also argues that the state's failure to reveal the fact that Ayers had given a statement to police in reference to another criminal prosecution constitutes reversible error.[12] According to Ayers's testimony at the posttrial hearing on defendant's motion for new trial, Ayers's 1999 statement to police indicated that a fellow inmate told Ayers that he had accidentally knocked a child down the stairs.

We are not satisfied that the state's failure to divulge this fact violates Rule 16 or *Brady* because defendant cross-examined Ayers at trial in great detail about his attempts to cooperate with the state in exchange for favorable treatment. Ayers testified that he wrote multiple letters to the Attorney General offering his cooperation. For example, Ayers admitted that he offered to testify against "a drug acquaintance," with whom he had committed a crime.[13] Counsel for defendant went as far as equating Ayers with "Judas." Thus, defendant effectively cross-examined Ayers on his cooperation with the state. Furthermore, Ayers's statement in the other case was not material to this case in that, even with that information, the jury still would have convicted defendant. Accordingly, the failure of the state to divulge the fact that Ayers gave a statement in another criminal case, in this instance, does not rise to a violation of either Rule 16 or *Brady*.

### 5

### Deliberate Nondisclosures

■ Our multifaceted analysis is not yet complete. Regardless of whether any

---

12. The defendant's factual assertions in reference to this argument are less than precise. In his brief to this Court, defendant argues that he was unaware of "the pattern of [Ayers's] false testimony in return for favorable treatment." At oral argument, defendant maintained that the state failed to disclose the fact that Ayers had withdrawn a statement that he made in another criminal case, implying that the state was aware of the withdrawal during defendant's trial. The defendant's assertions directly contradict the trial justice's finding that Ayers did not withdraw his statement until after the jury in this case returned its guilty verdict, and, thus, it was relevant solely to inquiry of whether the newly discovered evidence warranted a new trial. The defendant does not point us to any evidence supporting a conclusion that the state was aware of the withdrawal before the jury reached its verdict, and our review of the relevant portions of the transcript and record in this case does not cast any doubt on the trial justice's finding. Accordingly, we will analyze in this section only whether *the state's failure to disclose Ayers's statement in another*

*criminal proceeding* constitutes a discovery violation.

13. The defendant's cross-examination on this precise point was extensive. The cross-examination included the following exchanges between defendant's counsel and Ayers:

"And you say to yourself, 'I'm going to write [the Attorney General] a letter. See if I can trade something for my freedom?' Yes.";

"And you said, 'I want to give you some information about a person who did a B and E?' Yes.";

"Okay, and you said, you had some information about a pawn shop and a fellow that buys stolen goods? Yes.";

"Then you said, 'I have some information about a person who's robbing toolboxes?' Yes."; and

"You're the fellow that anybody who wants to tell about crimes, they go to you? Not really."

of the above instances constitutes a violation of Rule 16 or *Brady*, a deliberate nondisclosure, in which the state makes a "considered decision" to withhold evidence or fails to disclose "high value" evidence, requires automatic reversal. *Wyche*, 518 A.2d at 910 (quoting *United States v. Keogh*, 391 F.2d 138, 146–47 (2nd Cir. 1968)). As stated above, the state actually disclosed all the relevant twist tie evidence, and, thus, the deliberate nondisclosure rule does not apply to that argument. On the remaining issues, defendant fails to point to evidence that persuades us that the state made a "considered decision" to withhold the evidence. *Cf. State v. Perry*, 779 A.2d 622, 629 (R.I.2001) (holding that the state's failure to reveal that it had promised to help a witness leave the jurisdiction after testifying was not deliberate because there was "no evidence in the record of any deliberate nondisclosure by the prosecution of its plane-ticket discussions with [the witness]"). Finally, with respect to Ayers's convictions and Ayers's statement, the trial justice expressly found in her written opinion that no evidence existed to support the conclusion that the state deliberately withheld evidence. In the absence of strong evidence to the contrary, that conclusion is entitled to deference. Automatic reversal is not required in this case.

We will not address defendant's remaining arguments pertaining to Rule 16 and *Brady*, all of which are meritless.

## C

### Newly Discovered Evidence

■ Next, we turn to defendant's argument with respect to newly discovered evidence. Ayers, after the conclusion of this trial, withdrew a statement incriminating another defendant in a separate criminal case. In 1999, Ayers gave a statement to police indicating that a fellow inmate had admitted to him that he *accidentally* had knocked a child down the stairs. At the hearing on Briggs's motion for new trial, Ayers testified that an investigator for the Public Defender's office had come to see him about that other criminal case. Ayers said that the investigator showed him documents from that case that differed from his 1999 statement, specifically showing that the act was *intentional and not accidental.* Based on those documents, Ayers withdrew his 1999 statement. Ayers testified adamantly that, although he now believed his 1999 statement was inaccurate, it was nonetheless true that Ayers had been told in 1999 that the act had been accidental.[14] The defendant in the other criminal case pled *nolo contendere* to the charge of manslaughter. The defendant in this case contends that he is entitled to a new trial, pursuant to Rule 33, purely because of Ayers's withdrawal of his 1999 statement in the other case.

■ The test for whether newly discovered evidence warrants a new trial has two prongs. First, the evidence must be analyzed under the following four elements: (1) the new evidence must have been discovered since trial; (2) even with the exercise of due diligence, the evidence was not discoverable prior to trial; (3) the evidence must be material, and not merely impeaching or cumulative; and (4) the evidence must be so crucial that the jury probably would have acquitted the defendant. *State v. Luanglath*, 863 A.2d 631, 639 (R.I.2005). Second, the trial justice

---

14. The trial justice was satisfied with Ayers's testimony at the motion for a new trial in which he maintained he never knowingly lied under oath, but rather that he became convinced that what he had been told was, in fact, false. "Put differently, Ayers was not admitting to making a false statement, but to inadvertently delivering one."

then must exercise his or her independent judgment to determine whether the newly discovered evidence is sufficiently credible to warrant vacating a jury conviction. *Id.*

The trial justice in this case determined that Ayers's withdrawal of his statement in the other criminal prosecution was merely impeachment evidence with no direct bearing on defendant's guilt. We are in complete agreement. Although Ayers's testimony may be less believable in light of his withdrawal, the sole relevance of this new evidence is to prove Ayers's lack of credibility. Therefore, the impeachment evidence is not material under the third element of this test. Furthermore, in light of all the other incriminating evidence presented at trial, we would be reluctant to hold that had the jury known that Ayers withdrew his statement in the other criminal case, then it probably would have acquitted defendant. The law governing newly discovered evidence delicately balances the competing values of justice and finality. In this instance, a new trial is not warranted.

**D**

**Vouching**

The defendant also contends that the prosecutor inappropriately vouched for the credibility of White, the man who helped defendant purchase a handgun. During the cross-examination of White, defendant asked a question that began with the preface "and now you want to say * * *," to which the prosecutor objected by saying "that's what he's always said." The trial justice denied defendant's immediate motion to pass the case, but did caution the jury not to give credence to the prosecutor's statement. On appeal, defendant finds fault with that ruling.

A decision about whether a trial justice should pass the case and declare a mistrial rests in his or her sound discretion. *See State v. Lassiter,* 836 A.2d 1096, 1102 (R.I.2003). The trial justice was well within her discretion to give a cautionary instruction rather than take the more drastic measure of beginning the trial anew. Although the state's objection was not appropriate, its effect was relatively benign; no reversible error was committed in this respect.

**E**

**Motion for Judgment of Acquittal**

The defendant argues that the trial justice erred in denying his renewed motion for judgment of acquittal. Our standard of review is well established: " 'When reviewing the denial of a motion for judgment of acquittal, this Court applies the same standard as the trial justice.' " *State v. Werner,* 851 A.2d 1093, 1110 (R.I.2004). Analyzing the evidence in the light most favorable to the state, the trial justice, without weighing evidence or assessing credibility of the witnesses, must make all reasonable inferences consistent with guilt. *State v. Grayhurst,* 852 A.2d 491, 519–20 (R.I.2004). If sufficient evidence exists to support the elements of the crime charged, the trial justice must deny the motion. *Id.* at 520.

As previously noted, a wealth of evidence existed inculpating defendant of the crime charged. The defendant's apparent disinclination to return certain assets that he had harbored for Jacques gave him motive to kill her. The testimony of Shepard and Jerome placed defendant in Tiverton, Rhode Island, on the night of the murder. The testimony of White and Lyonnais demonstrated defendant's access to a handgun of the type used in the murder. An expert in gun residue testified that defendant's clothing tested consistent with the recent firing of a gun.

Finally, Ayers's testimony relayed defendant's recounting of the murder in specific detail. Viewing the evidence in its totality, the state easily met its burden. We hold that the trial justice properly denied defendant's motion for judgment of acquittal.

## F

### Meritless Arguments

After carefully reviewing defendant's remaining arguments pertaining to the exclusion of four separate police reports as inadmissible hearsay, the admission of a municipal tax card, the bolstering of testimony, the prosecutor's interruption of a witness, an expert witness's testimony concerning an imprecise drawing of the murder weapon, and the cross-examination of the daughter of the victim, we deem them all to be meritless. Accordingly, we need not address them.

## G

### Amalgam of Error

Finally, the defendant asserts that the amalgam of error polluted his right to a fair trial, and, thus, a new trial is warranted. Because we find that the trial justice did not commit a single prejudicial error, and, many of the defendant's arguments are meritless, we reject this argument. The amalgam of nothing is nothing.

### Conclusion

In closing, we note that the trial justice presided competently and fairly over a long and difficult trial. None of the arguments advanced by the defendant warrants a new trial. For the reasons stated, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice SUTTELL did not participate.