Anthony DeCIANTIS

v.

STATE of Rhode Island.

No. 2008–156–Appeal.

Supreme Court of Rhode Island.

July 12, 2011.

James J. McCormick, Esq., for Applicant.

Aaron L. Weisman, Department of Attorney General, for State of Rhode Island.

Present: SUTTELL, C.J., FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The applicant, Anthony DeCiantis, appeals from a judgment of the Superior Court dismissing his application for post-conviction relief. On appeal, the applicant contends that the hearing justice erred in four respects: (1) in incorrectly "characterizing" the applicant's claim as being "that the state wrongfully failed to disclose only one of William Ferle's charged crimes;"[1] (2) by erroneously "ruling that the [s]tate had no obligation to inform the [applicant] of William Ferle's uncharged crimes;" (3) by erroneously "holding [applicant] to a higher standard of 'materiality,' * * * than the standard required for the [s]tate's deliberate withholding of exculpatory evidence;" and (4) by finding that no prosecutorial misconduct had been committed in the applicant's case. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

### A

### The Applicant's Murder Trial

The applicant, Anthony DeCiantis, first appealed to this Court from a conviction by a Superior Court jury on June 7, 1984; he was convicted of murder in the first degree, the victim of that murder being one Dennis Roche. As a result of that conviction, Mr. DeCiantis received a life sentence—to be served consecutively to other sentences that he was then serving. Over a quarter of a century ago, this Court affirmed the judgment of conviction. *State v. DeCiantis*, 501 A.2d 365 (R.I.1985) (hereinafter *DeCiantis I* ).

---

1. As will be discussed at greater length, *infra,* William Ferle was one of the prosecution's witnesses at applicant's criminal trial.

In *DeCiantis I,* 501 A.2d at 365, we summarized the testimony and evidence presented at applicant's criminal trial—stating that the "state's evidence established a motive for the killing and linked [applicant] to the murder of Dennis Roche * * *." One witness testified at the murder trial that he saw two men "force the victim into a car driven by Anthony De-Ciantis." *Id.* Three other witnesses "testified about separate occasions on which [applicant] had admitted to killing Roche." *Id.* at 366. One of those three witnesses was William Ferle. As it is the trial testimony of Mr. Ferle that is the primary focus of applicant's appeal to this Court from the denial of his application for post-conviction relief, we shall provide a brief summary of that testimony to the extent necessary to consider applicant's appellate arguments.

### 1. The Testimony of William Ferle [2]

William Ferle testified for the prosecution at the murder trial of Mr. DeCiantis in 1984; he stated that, as of the time of trial, he had known Mr. DeCiantis for over five years. Mr. Ferle testified that, on an evening in December of 1981, he saw applicant at a nightclub. According to Mr. Ferle, it was on that evening at the nightclub that applicant told him that he had killed Mr. Roche. Mr. Ferle also testified that, on more than one occasion, Mr. De-Ciantis had told him his reason for having killed the victim; it was the testimony of Mr. Ferle that applicant stated that "Dennis Roche kept annoying him and throwing it in his face * * * about his brother being killed on Halloween night and that it might be his turn the next coming Halloween night." Mr. Ferle further testified that, on a few other occasions, applicant re-

peated his admission that he had committed the murder.

On cross-examination by defense counsel, Mr. Ferle was confronted with evidence of a 1982 verdict finding him guilty on charges of conspiracy and bank fraud. Mr. Ferle admitted to same, and he admitted that he had been sentenced to one year—six months to serve and six months of probation. Mr. Ferle also admitted on cross-examination during the murder trial that there was then pending a criminal information charging him with obtaining money under false pretenses. Mr. Ferle was also confronted with a pending indictment charging him with the robbery of "the 14 Carat Gold Store," and he admitted that he had been indicted on that charge. Mr. Ferle also admitted that, pursuant to another indictment, he was facing a murder charge. Finally, Mr. Ferle admitted that he had been indicted for the crime of arson in the first degree in connection with the burning of a farm in Cranston.

After defense counsel had confronted Mr. Ferle with these various pending charges, the following exchange between defense counsel and Mr. Ferle took place:

"Q So, are you telling us sir, that you are not disturbed about the fact that you have three indictments pending against you charging capital offenses in this [s]tate?

" * * * *

"A Well, I guess everybody once .. would be disturbed but that ain't why I am here. I just came here to tell the truth.

"Q Out of the goodness of your heart because you want to help the system?

"A Well, I gave my word that I would tell the truth of .. about any murders

---

2. Our summary of Mr. Ferle's testimony is derived from a portion of the original trial transcript, which was appended to applicant's brief to this Court.

that I was aware of and that is what I did and that is all I am here is to tell the truth."

Defense counsel then asked Mr. Ferle what promises and inducements had been offered to him in exchange for his testimony. Mr. Ferle indicated that nothing had been promised to him. He said that he had let it be known what he "would like to happen," but he testified that there had not yet been any "final commitments." When asked in a follow-up question what he "would like to happen," Mr. Ferle stated that he was interested in protection for him and for his family due to the fact that he was providing testimony "against top organized crime figures," who he said would kill him if they could "get to [him]." He added that he was also interested in serving whatever time he would have to serve in the custody of the State Police and not in prison—"because they can get to you in a prison."

When questioned again whether or not the "pendency of charges" against him concerned him, Mr. Ferle reiterated that he was "here to tell the truth." He stated that he had "made it [his] business that [he] wanted to clean up [his] life and just do the right thing." When further pressed by defense counsel as to whether or not he had made inquiries about what he could expect "by way of sentence," Mr. Ferle responded as follows:

"I was just depressed at the time and everything and I wasn't looking for any bargain. I wasn't demanding and I wanted this or that, I just said, 'I'd like to be protected' and see what could be done for me. I didn't really go into it and I talked it over with my wife and even my twelve year old daughter. It's something we decided to do the right thing and so I wasn't really ... as long as I knew they were safe and they were

happy that is mostly what I was concerned about."

Mr. Ferle was again asked by defense counsel whether he was concerned that he would go to prison "for all these crimes," and he responded as follows:

"Everybody cares, but whatever has to happen is going to happen. I can't change that. I *hope* it doesn't happen, but I don't *know* what's going to happen. All I am here is to tell the truth." (Emphasis added.)

Defense counsel also inquired on cross-examination with respect to whether or not Mr. Ferle was receiving or would receive in the future any stipend or monetary support. The following exchange occurred:

"Q Do you expect to go into the Federal Witness Protection Program with a stipend or something every month .. a salary?

" * * *

"A That really hasn't been discussed. I am in State Police custody. I haven't talked about any Federal programs.

"Q Who's supporting you now?

" * * *

"A I am in the custody of the Rhode Island State Police.

"Q Who supports your family?

" * * *

"A They're also in the State Police custody.

" * * *

"Q Right now, you are being supported by the taxpayers of the State of Rhode Island?

" * * *

"A I don't know that I am. I am in State Police custody."

## B

## The Instant Application for Postconviction Relief

In February of 1998, Mr. DeCiantis filed his third [3] application for postconviction relief, which application is the subject of the present appeal. Mr. DeCiantis filed an amended application shortly thereafter, in which he set forth allegations of "intentional withholding of exculpatory evidence" and "prosecutorial misconduct." [4]

## C

## The Hearing on the Application

On December 5 and 13, 2005 and on January 23, 2006, a hearing was held in the Superior Court for Providence County with respect to Mr. DeCiantis' application for postconviction relief. We summarize the testimony from that hearing that is pertinent to applicant's contentions on appeal.

### 1. The Testimony of David Leach

David Leach, who was called as a witness by applicant's attorney, testified that in 1984 he was a prosecutor who was involved in the prosecution of Mr. DeCiantis for the murder of Mr. Roche. He testified that in that year he had contact with William Ferle, who Mr. Leach indicated was acting as an informant against "many people involved in what we think of as organized crime * * *." Mr. Leach further described Mr. Ferle as "a low-level kind of an associate."

When asked whether or not he would "meet with Mr. Ferle from time to time to discuss what he knew and what evidence he could give," Mr. Leach responded that he had met with Mr. Ferle to discuss potential testimony, but he added that he "was not part of any debriefing of [Mr. Ferle] where any original matters came out that had not previously been brought to [his] attention by the State Police." He further explained as follows:

> "You know, something would come to the State Police's attention, they would look at it, they would bring it to my attention and [my co-counsel's], who was working on these cases, as well, was then Assistant Attorney General, and the information would be imparted to us and then there were times where we did speak with him directly, but we were not debriefing him."

The applicant's attorney then began to inquire into Mr. Leach's knowledge and recollection as to how Mr. Ferle came into police custody and as to how he was cultivated as an informant and witness. Mr. Leach confirmed that Mr. Ferle was "given bail" and, to the best of Mr. Leach's memory, was then transferred to protective custody for, among other reasons, facilitating his "availability as a potential witness." With respect to those arrangements for Mr. Ferle, it was Mr. Leach's testimony that, while his own position was not such that he could authorize such arrangements on his own, he nevertheless "had some input into the process."

Mr. Leach was next confronted with applicant's Exhibit 1, which was a document entitled "State's Supplemental Response to Defendant's Request for Discovery and Inspection," pertaining to Mr. DeCiantis'

---

**3.** Mr. DeCiantis has previously filed two other applications for postconviction relief; both were denied and dismissed by this Court on appeal. *DeCiantis v. State,* 666 A.2d 410 (R.I. 1995); *DeCiantis v. State,* 599 A.2d 734 (R.I. 1991).

**4.** Mr. DeCiantis made several other allegations in his amended application for postconviction relief that are not relevant to the issues raised in the instant appeal and that, therefore, need not be summarized.

murder trial. In that document the state identified Mr. Ferle as a witness, and a Bureau of Criminal Identification (BCI) record pertaining to Mr. Ferle was attached. The following exchange took place between applicant's attorney and Mr. Leach, regarding Mr. Ferle's BCI record:

"Q At the time this was provided to the defense, which was February of '84, was this—did this BCI comprehensively reflect all of the criminal activity of Mr. Ferle that you, yourself, were aware of at that time?

"A I would probably say no. This is not—this was not in the computerized age. This was a typewritten card, and I am well—although, I don't have the timeline exactly in mind, I know there were a number of offenses that he may not have been charged or did not come up until some later point so they were not actual charges on his record I would assume that you may be referring to.

"Q All right. Are you aware of having disclosed to the defense any other crimes where Mr. Ferle admitted his involvement other than what appears on the BCI?

"A I'm not—I'm not sure of that because I don't know in terms of the timeline where Mr. Ferle had testified in other cases prior to that in which the matters had become public or not so I don't know the answer to that right now."

Mr. Leach also testified as follows regarding the extent of his knowledge of any arrangements that had been made with Mr. Ferle for the purpose of obtaining his testimony:

"[M]y understanding is, from the very beginning, his main concern was that he not be in an ACI situation and that he asked that of the State Police. And, of course, they were not in authority to grant that but said they would do the best they could for him. That was conveyed to the members of the Attorney General's Office who also indicated that that was not something that could be comitted [*sic*] to * * *."

Mr. Leach then provided further testimony to the effect that a document "which set down specifics of a disposition which went before the court" was "not something that was drawn up or agreed to at the time that [he] was involved in the case."

With respect to whether or not Mr. Ferle would receive an "advantageous disposition," it was Mr. Leach's testimony that he "[knew] that [Mr. Ferle] *hoped*" for such a disposition but that Mr. Ferle "wouldn't have any commitment through [him] or [his co-counsel] or * * * a Deputy Attorney General, that that would happen * * *." (Emphasis added.)

Mr. Leach was then questioned again regarding what he had or had not disclosed to Mr. DeCiantis' trial attorney. Mr. Leach was asked whether he had "disclosed to the defense only that information shown on the BCI." He responded as follows:

"I don't know that to be true. I mean, I read some of the cross-examination of Ferle by [applicant's trial attorney], and it's clear to me that there were other crimes and instances which may not have been indicted at that point that he was crossing on. So it was clear to me, from what I read to refresh my recollection, that he was aware of them because he was asking questions about them. So I'm not sure if they were in another document. I'm not sure if they were public knowledge because Ferle had already testified to them or not. I just don't know at this point."

Shortly thereafter, the following exchange occurred:

"Q But the question, Mr. Leach, is simple. Did you know Mr. Ferle had admitted to involvement in more than the three cases that we just referred to?

"A I can only answer it by saying that I have no present recollection but, looking at the transcript, my sense is that I must have because my sentence ends in a place where it wouldn't end if I hadn't been asked a question at that point.

"Q So you must have had knowledge of more than three, correct?

"A I would have to say I assume that that is the case from—"

Mr. Leach was then asked whether or not he had disclosed to the defense Mr. Ferle's involvement in a robbery referred to as the "Heritage Loan Robbery." [5] Mr. Leach testified that he could not "specifically answer that one way or the other;" he also stated that he believed that applicant's trial attorney was aware of those other cases, but that he did not "remember specifically how that information was transmitted * * *." Similarly, when asked about disclosure of Mr. Ferle's alleged involvement in the murder of one Ronald McElroy, Mr. Leach testified that he had "no specific recollection [ ]" and that he did not "know one way or the other any particular discussion [that he] might have had with [applicant's trial attorney] and/or anyone else about it."

The applicant's attorney also questioned Mr. Leach with respect to his understanding of his obligation to disclose exculpatory evidence. Mr. Leach responded that "anything that was exculpatory would be absolutely something that one would inform defense counsel about;" he also answered in the affirmative when asked whether the obligation to disclose continues "to points

beyond trial." In addition, Mr. Leach stated as follows: "I think the matters that you're talking about, as best I understand, are matters that would have to do with the impeachment of Mr. Ferle * * *."

Mr. Leach was then confronted with applicant's Exhibit 4, which was a "State's Supplemental Answer" pertaining to the criminal prosecution of a person other than Mr. DeCiantis; that Supplemental Answer, dated September 12, 1984, was signed by Mr. Leach's co-counsel in that other case (who was also his co-counsel in Mr. DeCiantis' case). In that document, it is stated that "[d]uring the course of the de-briefing of William Ferle, he has indicated his involvement in the following criminal activity." The Supplemental Answer proceeded to itemize six cases concerning which indictments by grand jury had been issued, two cases that were considered "continuing investigations by the State Wide Grand [Jury]," nine cases as to which the statute of limitations had run, three cases "involving organized crime figures as victims where no complaining victim had come forward," and four cases of robbery in which "William Ferle understands that he will testify * * * and is a potential defendant * * *."

When asked whether the September 12, 1984 Supplemental Answer "refers to many more than the three crimes that [defense counsel] cross-examined Ferle about in Mr. DeCiantis' trial in June," Mr. Leach responded in the affirmative. He was then asked whether it was "fair to say that all of the information of [those] crimes contained in the supplemental answer wasn't learned by the [s]tate just shortly before [that] trial." In response, Mr. Leach stated that he "would have to assume, no," but he added that he did not

**5.** The Heritage Loan Robbery is mentioned in the debriefing statement that constitutes applicant's Exhibit 2.

"have any recollection as to when the different incidents that are mentioned came to the attention of the State Police."

Mr. Leach was also confronted with applicant's Exhibit 7, entitled "Memorandum of Agreement." That document encapsulated the agreement between Mr. Ferle, the Rhode Island Attorney General, and the Rhode Island State Police. The twelfth provision of that agreement set forth an itemized list of "sums of money" that Mr. Ferle had received "for his support in a 'safe' house and for the support of his wife and child." Mr. Leach testified that he did not believe that those amounts were disclosed to Mr. DeCiantis' defense counsel; he added that he did not "believe [he] knew them at the time," and he further stated that the Memorandum of Agreement was prepared after he was no longer in the Attorney General's Office.

When asked whether or not he felt that it was "incumbent" upon him to "inquire as to what was being spent for Ferle's support" so that he could "provide this information to the defense," Mr. Leach testified that he did not feel that making such an inquiry was incumbent upon him. He explained that, to his knowledge, "this was something that was done for [Mr. Ferle's] safety and protection and was not something that [he] envisioned as a promise or a reward."

Mr. Leach was also asked whether he had been the subject of court decisions involving the withholding of evidence from the defense. Mr. Leach confirmed that he "was the prosecutor in several cases that [applicant's attorney was] referring to which involved issues involving a Rule 16, each one being a different issue, yes."

During Mr. Leach's cross-examination by the state, he reiterated that, at the time of Mr. DeCiantis' trial, he was not in a position to "set any sort of policy as it related to the treatment of confidential informants" or "protected witnesses." Mr. Leach also reiterated his earlier testimony, by stating that he "was not physically present at any time going through [Mr. Ferle's] debriefings." He further testified that he purposefully refrained from interviewing parties who had not yet admitted to crimes and from taking initial statements from potential defendants so as not to "make [him]self a witness to a trial."

On cross-examination, Mr. Leach was again shown applicant's Exhibit 1 (*viz.*, the "State's Supplemental Response to Defendant's Request for Discovery and Inspection" with Mr. Ferle's BCI record appended thereto). He confirmed that there was no reference on the appended BCI record to a pending murder charge or to a pending robbery charge. Mr. Leach was then shown portions of the transcript of Mr. DeCiantis' trial where defense counsel was cross-examining Mr. Ferle relative to a pending robbery charge and a pending murder charge. Mr. Leach confirmed that he did not object to either line of questioning.

Mr. Leach was also shown a portion of the trial transcript in which he was asked by the trial justice whether or not Mr. Ferle had been given any promises. Mr. Leach read his response from the transcript:

"I would indicate, Your Honor, he has nothing in writing he has indicated to come forward. He is in Protective Custody, and he does not know what the ultimate disposition of his cases will be and the cases for which he has been indicted. He has testified in the Grand Jury on all of those cases and waived all of his Fifth Amendment privileges."

It was then Mr. Leach's testimony at the postconviction relief hearing that he had not seen or read anything which would suggest to him that his answer to the trial

justice at the time of the DeCiantis trial had not been truthful.

Mr. Leach was then shown the state's Exhibit A, which he identified as a document furnished by the state to defense counsel in a different criminal proceeding. The document was entitled "State's Answer to Defendant's Motion to be Furnished with Evidence Favorable to the Accused." That document indicated that "[n]o promises, rewards or inducements, other than personal safety and the safety of his family have been made to William R. Ferle * * *." Mr. Leach confirmed that the document was dated May 21, 1984.

### 2. The Testimony of Major Michael Urso

Michael Urso, who was also called as a witness by applicant's attorney, testified that he held the rank of major when he retired from the Rhode Island State Police. He stated that in 1984 he was a lieutenant, and he confirmed that he was involved in the "handling" of Mr. Ferle as a witness.

Major Urso confirmed that Mr. Ferle had been in custody for at least six months prior to the trial of Mr. DeCiantis in June of 1984. When asked whether, in "the first two months that [Mr. Ferle] was in custody," the "majority" of Mr. Ferle's crimes were disclosed to Major Urso, the retired police officer testified that he could not "say that for sure." Major Urso explained his answer as follows:

"Because as we went along, he would think of things that happened, and as time went on, he would think of other crimes that he just didn't think of, and he would bring them up at that point, and then we would document them."

Upon further questioning by applicant's attorney, Major Urso indicated that he could not "put a period of time" or indicate in which month it was when Mr. Ferle made admissions as to everything that he had done. It was also Major Urso's testimony that "there was no time set" by which time Mr. Ferle had to disclose all of his criminal involvement. Upon further inquiry by applicant's attorney, Major Urso stated that it was "very possible" that, by June of 1984, Mr. Ferle would have mentioned every crime in which he had been involved. Major Urso also testified that, according to his recollection, a representative of the Attorney General was not with him during any debriefings during which Mr. Ferle's disclosures were made, thereby confirming Mr. Leach's testimony to that effect.

Major Urso was confronted with the transcript of his own testimony on August 29, 1984 at the trial of a different criminal case. Major Urso was referred to a portion of the transcript of that trial where he was asked whether he had told Mr. Leach and his prosecutorial co-counsel that money was being supplied for Mr. Ferle's "rent and the like" and where he responded that he believed that he had done so; he added that his best estimate as to when he provided the prosecutors with that information would have been January of 1984. Major Urso stated that he recalled giving that testimony; he further stated that, if he said it at that time, then he was confident that it was true. Major Urso was then questioned about specific sums of money and about support that Mr. Ferle received.

Major Urso was also questioned about applicant's Exhibit 2—a debriefing statement made by Mr. Ferle in connection with the Heritage Loan Robbery. He identified the exhibit as a report prepared by Detective Anthony Pesare, dated January 24, 1984. It was Major Urso's testimony concerning that report that, "prior to the case going to the Grand Jury, it would be given, more than likely, to the Attorney

General." When asked whether he recalled that an indictment of Mr. Ferle for that robbery was returned in February of 1984, Major Urso testified that he did not have a recollection of that date.

Major Urso was also shown applicant's Exhibit 3, which he identified as a debriefing statement made by Mr. Ferle relative to a particular murder. He acknowledged that the debriefing statement was dated February 29, 1984, but he testified that he did not know when that debriefing statement would have been communicated to the Attorney General's Office. Major Urso was then asked by the hearing justice whether he believed that it was the custom and practice of the State Police "to have those kind[s] of discussions with members of the Attorney General's staff prior to its submission of the [s]tate to bring it to Grand Jury * * *." Major Urso responded in the affirmative.

Major Urso was then shown applicant's Exhibit 4 (the state's Supplemental Answer pertaining to another criminal prosecution, which contained a list of Mr. Ferle's criminal activities); he was asked to confirm that all of the crimes listed on that exhibit had come to light in the debriefing sessions conducted by Major Urso and his colleagues, and he once again responded in the affirmative.

On cross-examination by the state, Major Urso testified that, in many cases, after a debriefing, police follow-up would be required. And he confirmed that it was "fair to say" that "police follow-up [was] necessary before indictments would issue" with respect to the debriefings which were the subject of applicant's Exhibits 2 and 3. Major Urso also confirmed on cross-examination that, at "some point," the Attorney General's Office was made aware of the fact that Mr. Ferle was in custody, that there was "some sort of * * * set up that the State Police had with him," in which he was being financially supported.

Major Urso testified that, while Mr. Ferle was in the custody of the State Police, it was never contemplated that he would hold a job—because, in the Major's words, "his life was in danger." Major Urso confirmed that, during the period in which Mr. Ferle was being debriefed and in which he was offering testimony, he was "being supported in a custody scenario by the State Police." He testified that a fund was tapped to assist with that support; he added that the money in that fund came from the New England State Police Compact Association. Major Urso also testified that the State Police made mortgage payments for Mr. Ferle until his house was sold; he also confirmed that there had been a plan to use the proceeds from the sale of the house to repay the New England State Police Compact Association.

On redirect, Major Urso confirmed that, in a case such as applicant's, which was not a State Police case but a Providence Police case, some other agency would be doing the investigative work. Major Urso then confirmed that, in some cases, "the State Police would have no interest in holding back information;" he said that, instead, "the interest would be getting it as quickly as possible to the Attorney General to decide how best to prosecut[e]." [6]

### 3. The Testimony of Anthony DeCiantis

Anthony DeCiantis was the last witness to testify during the hearing on his

---

**6.** After the testimony of Major Urso, applicant renewed his "Motion for the State to Compel the Process of a Witness," in which he had moved the court "to order the State of Rhode Island to compel process for the purpose of a hearing and/or deposition of William Ferle who was placed in State Police Custody." After hearing argument from both sides, the hearing justice denied the motion.

application for postconviction relief. The testimony elicited on direct and cross-examination primarily concerned *when* Mr. DeCiantis acquired the information necessary to allege that the prosecution had withheld exculpatory evidence.[7] On cross-examination, counsel for the state also elicited testimony to the effect that applicant's trial attorney had passed away prior to the postconviction relief hearing and so was unavailable to testify regarding what information he did or did not have at the time of Mr. DeCiantis' trial.

## D

### The Hearing Justice's Decision

A written decision, denying the application for postconviction relief, was issued on March 7, 2007. We summarize below only those portions of the hearing justice's decision that pertain to the issues that applicant has raised on appeal.

With respect to applicant's contention that the prosecution withheld information about specific promises, rewards, and inducements made to Mr. Ferle, the hearing justice found as follows:

> "The record at trial clearly reveals that the [s]tate disclosed that Ferle was in the custody of the Rhode Island State Police, and that while he *hoped* he and his family would remain in custody, and that, if he were to serve any jail time, that he would do so in the custody of the Rhode Island State Police, at the time

he had been given no promises for his pending cases." (Emphasis in original.)

The hearing justice also noted that, at Mr. DeCiantis' trial, Mr. Ferle "was subject to thorough cross-examination regarding these rewards and inducements;" the hearing justice also noted that counsel for applicant had "explored at length the basis of financial support of the witness and his family while in the custody of the Rhode Island State Police." Accordingly, the hearing justice then held that "there is no reasonable probability of a different result had the [applicant] been provided with the specific expenditures made on Ferle at the time of trial."

The hearing justice also addressed applicant's argument that the prosecution had intentionally withheld an uncharged act (*viz.*, the murder of Ronald McElroy), which act the hearing justice noted was "admitted to by Ferle prior to trial." The hearing justice first stated that "there exists no authority to support the [applicant's] proposition that the [s]tate is obligated to inform opposing counsel of *uncharged* admissions of a witness." (Emphasis in original.) The hearing justice then found that the jury "already knew of Ferle's federal prison sentence for bank fraud and of his pending charges for arson, fraud, filing false papers and murder;" the hearing justice based that finding on the fact that testimony concerning those points had been elicited during cross-examination at applicant's criminal trial.[8] Accordingly, the hearing

---

7. The record indicates that, at one point, the state moved to dismiss Mr. DeCiantis' application on the basis of the doctrine of *res judicata*. We decline to address the merits of that contention in this opinion, although we are mindful that, in view of the fact that this is applicant's third application for postconviction relief, that doctrine may very well be applicable in the future should applicant file subsequent applications.

8. The hearing justice also quoted from this Court's 1985 opinion to the effect that "[c]ross examination [at trial] revealed that Ferle had served time in federal prison for bank fraud and that he also had charges pending for murder, arson, robbery, and filing false papers." *State v. DeCiantis*, 501 A.2d 365, 366 (R.I.1985).

justice held that "the addition of an immaterial uncharged admission creates no reasonable probability of a different result."

The hearing justice also briefly addressed applicant's allegations of prosecutorial misconduct on the part of Mr. Leach. First, the hearing justice noted that, during the hearing and in his supporting memorandum, applicant had alluded to the fact that Mr. Leach "was involved in other criminal cases where convictions were reversed based on 'prosecutorial misconduct' in the form of deliberate discovery withholding." With respect to Mr. Leach's conduct in those "other criminal cases," the hearing justice commented that "the law generally distrusts such propensity evidence * * *." Then, focusing on Mr. DeCiantis' case, the hearing justice found Mr. Leach's testimony at the hearing on the application for postconviction relief to be "compelling;" he stated that Mr. Leach's testimony "supported the [s]tate's position that no prosecutorial misconduct was committed *in this case.*" (Emphasis in original.)

On March 27, 2007, an order entered denying Mr. DeCiantis' application for postconviction relief; judgment entered for the state on the same day, dismissing Mr. DeCiantis' application. The applicant filed a timely notice of appeal.

## II

### Standard of Review and Controlling Legal Principles

 Pursuant to the provisions of G.L.1956 § 10–9.1–1, "the remedy of postconviction relief is available to any person who has been convicted of a crime and who thereafter alleges either that the conviction violated the applicant's constitutional rights or that the existence of newly discovered material facts requires vacation of the conviction in the interest of justice." *Page v. State*, 995 A.2d 934, 942 (R.I.2010) (quoting *Mattatall v. State*, 947 A.2d 896, 901 (R.I.2008)); *see also Washington v. State*, 989 A.2d 94, 98 (R.I.2010). An applicant for postconviction relief bears the burden of proving, by a preponderance of the evidence, that such relief is warranted in his or her case. *Page*, 995 A.2d at 942; *Mattatall*, 947 A.2d at 901 n. 7.

 In conducting appellate review, this Court "will not disturb the findings of a hearing justice in the postconviction relief context absent clear error or a showing that the [hearing] justice overlooked or misconceived material evidence." *Page*, 995 A.2d at 942 (brackets in original) (internal quotation marks omitted); *see also Washington*, 989 A.2d at 98. However, to the extent that an applicant's appeal presents "questions of fact concerning whether a defendant's constitutional rights have been infringed" or "mixed questions of law and fact with constitutional implications," we review same in a *de novo* manner. *Page*, 995 A.2d at 942 (quoting *Ouimette v. State*, 785 A.2d 1132, 1135 (R.I.2001)); *see also Washington*, 989 A.2d at 98; *Mattatall*, 947 A.2d at 901. Nevertheless, when we are called upon to conduct such a "*de novo* review with respect to issues of constitutional dimension, 'we still accord great deference to a hearing justice's findings of historical fact and to inferences drawn from those facts * * *.'" *Page*, 995 A.2d at 942 n. 18 (omission in original) (quoting *Mattatall*, 947 A.2d at 901).

## III

### Analysis

The applicant has specified four separate "errors claimed." However, in our analysis of the alleged errors, we must grapple at the outset with the basic question of whether or not the prosecution

withheld evidence in violation of discovery rules and in violation of applicant's right to due process.

■ We have stated that the "overarching purpose of Rule 16 [of the Superior Court Rules of Criminal Procedure] is to ensure that criminal trials are fundamentally fair." *State v. Briggs,* 886 A.2d 735, 754 (R.I.2005) (internal quotation marks omitted); *see also State v. Langstaff,* 994 A.2d 1216, 1219 (R.I.2010). With respect to persons whom the state intends to call as witnesses, Rule 16 requires that the state produce any of their prior recorded statements, a summary of their expected trial testimony, and any records of their prior convictions. *E.g., State v. Chalk,* 816 A.2d 413, 418 (R.I.2002); *State v. Brown,* 709 A.2d 465, 469 (R.I.1998). But the state's discovery obligations extend beyond the literal language of Rule 16; this Court has expressly stated that, "[w]hen evidence does not fit one of these three categories, but may nonetheless be *helpful to defendant's effective cross-examination* of a witness, a defendant's right to that evidence arises from the right of confrontation, and thus becomes an issue only when a defendant is improperly denied the ability to confront and to effectively cross-examine an adverse witness at trial." *Chalk,* 816 A.2d at 418 (emphasis added) (internal quotation marks omitted); *see also Briggs,* 886 A.2d at 754.

■ In addition to the requirements imposed by Rule 16 and this Court's rulings as to discovery obligations, the Due Process Clause of the United States Constitution, as interpreted by the United States Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, "re-

quires that the state provide a criminal defendant with certain information." *State v. McManus,* 941 A.2d 222, 229 (R.I. 2008); *see also Briggs,* 886 A.2d at 754–55; *Chalk,* 816 A.2d at 418. "In accordance with *Brady,* if a prosecutor has suppressed evidence that would be favorable to the accused and the evidence is material to guilt or punishment, the defendant's due-process rights have been violated and a new trial must be granted." *McManus,* 941 A.2d at 229–30; *see also Briggs,* 886 A.2d at 755. The duty to disclose, pursuant to *Brady,* "encompass[es] impeaching material as well as exculpatory evidence." *Chalk,* 816 A.2d at 418.

■ In conducting a due process inquiry pursuant to *Brady,* the first factor to be addressed is whether or not the nondisclosure at issue was deliberate. *See Chalk,* 816 A.2d at 418–19. The inquiry begins with that question because, as this Court has consistently held, deliberate nondisclosure constitutes "grounds for a new trial regardless of the degree of harm to the defendant." *Id.* at 419; *see also McManus,* 941 A.2d at 230; *Briggs,* 886 A.2d at 755.[9] With respect to what constitutes *deliberate* nondisclosure, we have described it as being a "considered decision to suppress * * * for the purpose of obstructing" or a failure on the part of the state "to disclose evidence whose high value to the defense could not have escaped * * * [the state's] attention." *State v. Wyche,* 518 A.2d 907, 910 (R.I.1986) (omissions in original) (quoting *United States v. Keogh,* 391 F.2d 138, 146–47 (2d Cir.1968)); *see also McManus,* 941 A.2d at 230; *Briggs,* 886 A.2d at 755; *Chalk,* 816 A.2d at 419.

---

**9.** It should be recalled that our standard with respect to deliberate nondisclosures "provides even greater protection to criminal defendants than the one articulated [by the United States Supreme Court]." *State v. Chalk,* 816 A.2d 413, 418–19 (R.I.2002) (brackets in original).

█ If however, the nondisclosure is not deliberate, then the "prejudicial effect" of the nondisclosure must be evaluated. *Chalk*, 816 A.2d at 419. At this analytical juncture, the applicant "bears the burden of establishing that it was prejudicial by showing that the nondisclosed evidence was material because 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citation omitted) (quoting *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)); *see also McManus*, 941 A.2d at 230. We have referred to this burden that an applicant must bear as being a requirement that there be a "showing of materiality." *Briggs*, 886 A.2d at 755; *see also McManus*, 941 A.2d at 230.

Having set forth the state of the law with respect to the nondisclosure of exculpatory evidence, we shall now address applicant's appellate arguments in the order that best fits into the above-outlined analytical framework.

## A

### The Alleged Prosecutorial Misconduct

█ On appeal, applicant contends that the hearing justice erred by applying a "higher standard of 'materiality' * * * than the standard required for the [s]tate's deliberate withholding of exculpatory evidence." In order to properly address this particular appellate contention, we must engage in a two-step inferential process.

First, it is clear to us that, where a nondisclosure is *not* deliberate, applicant would be required to make a showing of materiality—and our review of applicant's brief has convinced us that he does not dispute that point.[10] Accordingly, it would appear implicit in applicant's specification of error that he is actually contending that the hearing justice erred in finding that the nondisclosure in the instant case was *not deliberate*. A closely related appellate contention of applicant's is that the hearing justice erred in finding that no prosecutorial misconduct occurred in his case.

It is true that nowhere in his rescript decision does the hearing justice explicitly state that the failures to disclose were not deliberate. However, after reviewing the entire record, including a reading of the hearing justice's rescript decision as a whole, it is clear to us that the hearing justice did indeed make an assessment as to the deliberateness (*vel non*) issue and did conclude that there was no deliberate failure to disclose.

In assessing whether prosecutorial misconduct had been committed in the instant case, the hearing justice observed that he had heard testimony "regarding Prosecutor Leach's *actions*." (Emphasis added.) The hearing justice stated the following with respect to that testimony: "[T]he Court * * * found this *compelling* testimony supported the [s]tate's position that no prosecutorial misconduct was committed *in this case*." (First emphasis added; second emphasis in original.)[11] Accord-

10. In the instant case, while the hearing justice properly cited this Court's opinion in *State v. Wyche*, 518 A.2d 907 (R.I.1986), for the proposition that a *deliberate* nondisclosure would automatically result in a new trial, he went on to state: "Thus, in *either* instance—a deliberate suppression or a mere failure to disclose—the Court must *first* determine whether or not the 'missing' evidence was material." (Emphasis added.) The just-quot-

ed statement is not consistent with our opinions in such cases as *Wyche*, 518 A.2d at 910, and *State v. Stravato*, 935 A.2d 948, 953 (R.I. 2007), where we held that the issue of materiality is of no moment in a case of *deliberate* nondisclosure.

11. It should be observed that the emphasis which the hearing justice gave to the fact that he was making a determination *"in this case"*

ingly, it is clear to us that the hearing justice made a credibility determination, finding Mr. Leach's testimony *credible:* and we perceive nothing in the record to suggest that that credibility determination was clearly erroneous. *See B.S. International Ltd. v. JMAM, LLC,* 13 A.3d 1057, 1062 (R.I.2011) ("It is self-evident that a trial justice sitting without a jury must often make credibility determinations in order to arrive at the necessary findings of fact. We accord a substantial amount of deference to those determinations * * *.").

Since much of Mr. Leach's testimony was to the effect that he had not deliberately withheld exculpatory evidence from Mr. DeCiantis or his attorney, we are satisfied that we can infer from the hearing justice's credibility determination that he did not find any *deliberate* nondisclosure on the part of the prosecution. In view of the clear import of the hearing justice's overall ruling, we see no need for a remand with respect to the deliberateness issue; we hold that the hearing justice did not err in applying the materiality standard to applicant's case, nor did he err in his determination that no prosecutorial misconduct occurred.

## B

## The Ruling with Respect to Uncharged Crimes and Characterization of Applicant's Claim

◼ Mr. DeCiantis' other two appellate contentions concern the hearing justice's ruling as to whether the prosecution was required to disclose Mr. Ferle's uncharged crimes, as well as the hearing justice's "characterization" of applicant's claim as

being "that the state wrongfully failed to disclose only one of William · Ferle's charged crimes." Since both of these contentions necessarily relate to what constituted the universe of allegedly improperly withheld evidence, we shall address both contentions by conducting the requisite *de novo* review with respect to whether applicant has satisfied his burden with respect to the issue of materiality.

We begin our analysis by clarifying that, when the hearing justice stated that applicant was not entitled to the disclosure of Mr. Ferle's uncharged acts, that statement was inconsistent with our well-settled case law. It is true that the plain language of Rule 16 requires in pertinent part only that the prosecution provide a defendant with "all reports or records of prior convictions" of those whom the prosecution expects to call as witnesses. Significantly, however, the mandates of *Brady* and of our case law interpreting *Brady* and embroidering upon its rationale require that the prosecution provide the defendant with other information favorable to the accused, including evidence which could be used to impeach the testimony of a witness. *McManus,* 941 A.2d at 229–30; *Briggs,* 886 A.2d at 754–55; *Chalk,* 816 A.2d at 418. It is clear to this Court that any uncharged alleged crimes of Mr. Ferle should have been disclosed to defense counsel—because counsel might have used them to further impeach Mr. Ferle's testimony. The numerous uncharged crimes for which Mr. Ferle might have faced prosecution could have been used to cast further doubt upon the testimony of that witness—by suggesting to the jury that his testimony

was predicated upon the fact that he had been made aware of several prior cases where Mr. Leach had been the prosecutor and where this Court vacated the convictions based upon prosecutorial misconduct that was somewhat similar to what was alleged in the instant

case. Given the fact that Mr. Leach's prior history might have made the hearing justice more sensitive to allegations of misconduct, we are further satisfied that he thoroughly evaluated the testimony and evidence proffered at the hearing.

was motivated more by the hope of obtaining a favorable disposition with respect to his alleged crimes than by the altruistic desire to provide truthful testimony about Mr. DeCiantis' alleged crime.

 Having determined that Mr. Ferle's uncharged crimes should have been disclosed to Mr. DeCiantis, we have next proceeded to a *de novo* determination of whether or not Mr. DeCiantis has satisfied his burden of "showing that the non-disclosed evidence was material"—meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would have been different.*" *See Chalk,* 816 A.2d at 419 (emphasis added) (internal quotation marks omitted). And, based upon our review of the evidence presented at trial, with particular focus on the testimony of Mr. Ferle, as well as the evidence and testimony presented by applicant during the hearing on his application for post-conviction relief, we hold that Mr. DeCiantis has not made the requisite showing of materiality. *See id.*

On cross-examination during the murder trial, Mr. Ferle was confronted with his prior conviction of conspiracy and bank fraud, as well as pending charges of obtaining money under false pretenses, robbery, arson, and even murder. Mr. Ferle was also questioned as to (1) whether or not he was providing testimony "[o]ut of the goodness of [his] heart;" (2) what promises or inducements he had been given in exchange for his testimony; and (3) what he "would like to happen" as a result of his providing testimony that supported the prosecution's case. Mr. Ferle was

questioned repeatedly with respect to what he hoped to obtain in return for his testimony. Finally, he was also questioned explicitly as to whether or not he was receiving monetary support from the state or from the police.

It is clear to us that it could not have escaped the attention of the jury that Mr. Ferle had an *extensive* criminal background, that he had decided to testify against members of organized crime (and that he was recently such a member himself), and that he hoped to receive protection and avoid incarceration in exchange for his testimony. We are unpersuaded that evidence of additional criminal activity on the part of Mr. Ferle would have materially changed the jury's evaluation of him as a witness or would have changed the ultimate result of the proceeding. For these reasons, Mr. DeCiantis has not met his burden. *See Chalk,* 816 A.2d at 419.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.

Justice GOLDBERG and Justice INDEGLIA did not participate.