# United States Court of Appeals
## For the First Circuit

No. 12-2383

ANTHONY DECIANTIS,

Petitioner, Appellant,

v.

A.T. WALL,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

James T. McCormick, with whom McKenna & McCormick was on brief, for appellant.
Aaron L. Weisman, Assistant Attorney General, Rhode Island, with whom Peter F. Kilmartin, Attorney General, Rhode Island, was on brief, for appellee.

July 1, 2013

**LYNCH, <u>Chief Judge</u>**.  In 1984, appellant Anthony DeCiantis was tried in Rhode Island state court for the killing of Dennis Roche, convicted of first-degree murder, and sentenced to life imprisonment.  In 1998, he filed an application for postconviction relief in Rhode Island state court, seeking relief based on the prosecution's alleged failure to turn over exculpatory evidence during his trial.  The Superior Court for Providence County denied DeCiantis's application in 2007, <u>DeCiantis</u> v. <u>State</u> (<u>DeCiantis II</u>), No. PM 98-0899, (R.I. Super. Ct. Mar. 7, 2007), and the R.I. Supreme Court affirmed this denial in 2011.  <u>See</u> <u>DeCiantis</u> v. <u>State</u> (<u>DeCiantis III</u>), 24 A.3d 557 (R.I. 2011).  The R.I. Supreme Court held that the withheld information was not material under the <u>Brady</u> test for materiality.  <u>See</u> <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963).

DeCiantis then filed a petition, in 2012, for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the Rhode Island U.S. District Court.  The court denied the petition in thoughtful opinions.  <u>See</u> <u>DeCiantis</u> v. <u>Wall</u> (<u>DeCiantis V</u>), C.A. No. 12-018-M, 2012 WL 5287036 (D.R.I. Oct. 24, 2012); <u>DeCiantis</u> v. <u>Wall</u> (<u>DeCiantis IV</u>), 868 F. Supp. 2d 1 (D.R.I. 2012).  DeCiantis has appealed.  We affirm because the decision of the R.I. Supreme Court was neither contrary to nor an unreasonable application of controlling Supreme Court case law, and so relief is precluded by the terms of the Anti-Terrorism and Effective Death Penalty Act (AEDPA).  <u>See</u> 28 U.S.C. § 2254(d)(1).

We describe the facts found by the R.I. Supreme Court, adding other facts from the record that are consistent with these findings. Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006).

A.         The Testimony at DeCiantis's Trial

We use the R.I. Supreme Court's summary of the evidence presented at DeCiantis's June 1984 murder trial. See DeCiantis III, 24 A.3d at 559-60 (citing State v. DeCiantis (DeCiantis I), 501 A.2d 365, 365 (R.I. 1985)). As the court recounted:

> The state's witness Louis Schiappa testified that on December 4, 1981, he observed two other men force the victim into a car driven by Anthony DeCiantis. The witness stated that he had seen DeCiantis drive the car on prior occasions, and he identified the first two letters on the license plate. These two letters were identical to those on the registration of a car owned by defendant's sister.
>
> The next day Dennis Roche's body was discovered in a dump in Providence. According to Deputy Medical Examiner Arthur Burns, Roche had died from a gunshot wound to the "trunk." Roche had suffered a second gunshot wound, several stab wounds, and injuries to the face and head consistent with his having been run over by a car.
>
> The state offered three additional witnesses, each of whom testified about separate occasions on which defendant had admitted to killing Roche. Louis Campagnone testified that approximately two months after Roche's murder, he and defendant were in a restaurant when DeCiantis admitted to having killed Roche, claiming that he did it because he believed Roche to have been responsible for the disappearance of DeCiantis' brother, Rocco.
>
> Robert Livingston testified that during the summer of 1982, he and defendant had a conversation in which

"Anthony DeCiantis told me that he and Ricky Silva had killed Dennis Roche . . . . He said that Ricky had shot him and he had stabbed him." Livingston also testified that Rocco DeCiantis's disappearance had motivated the killing.

DeCiantis I, 501 A.2d at 365-66 (alteration in original).

The third witness who testified that DeCiantis admitted to Roche's killing was William Ferle. Ferle testified that in December 1981, DeCiantis told him that he and Silva "had killed Dennis Roche, drove over him with a car, shot him." According to Ferle, DeCiantis said he killed Roche because "Roche kept annoying him and throwing it in his face that about [sic] his brother being killed on Halloween night and that it might be his turn the next coming Halloween night." Ferle testified that DeCiantis also admitted on a few other occasions that he killed Roche. DeCiantis III, 24 A.3d at 560.

Ferle was extensively impeached on cross-examination by defense counsel, using Ferle's criminal history and questioning whether his testimony was motivated by the desire for state protection or for a lesser sentence on pending charges, and hence was not truthful. Ferle admitted that he had been found guilty of conspiracy and bank fraud in 1982, and that charges were pending against him for robbery, murder, first-degree arson, and obtaining money under false pretenses. Id. Ferle was asked whether it was the investigation of the arson which had prompted him to testify, or whether he was testifying "[o]ut of the goodness of [his] heart

. . . to help the system?" Id. Ferle answered that "I gave my word that I would tell the truth of . . . about any murders that I was aware of and that is what I did and that is all I am here is to tell the truth." Id. at 560-61 (alteration in original) (internal quotation marks omitted).

Defense counsel persisted:

Q: What would you like to happen with respect to your coming forward voluntarily and giving this testimony in these cases?

A: Well, what I suggested was that I wanted protection for me and my family. My wife and daughter, because a lot of the testimony I gave is against top organized crime figures which I was involved with and if they could get to me, they would kill me and that if whatever time I had to serve, if I could serve it in the custody of the State Police and not in a prison because they can get to you in a prison. I know how things work. I have been around them for ten years, you know, when I was in Danbury, I heard of things happening outside. Word gets around. I don't feel I would be safe in a prison.

See id. at 561. Defense counsel continued:

Q: And is it your claim, sir, that you have been promised nothing by way of consideration . . . by way of sentence for [your] testimony?

A: Like I said, there hasn't been no final commitment given to me. I don't really know what's going to happen at this point.

Q: You expect . . .

A: I am sure that I will be given protection somehow. They will have to do that unless I'll be dead.

Q: You expect more than protection for yourself and your family, do you know, Mr. Ferle?

A:    I'd like for that to happen.

Q:    You [would] very much like for that to happen,
      wouldn't you?

A:    I think anybody would.

Q:    Isn't it a fact that you are going to get it, sir?

A:    I can't say that truthfully, I don't know that.

.  .  .

Q:    You're telling us, then, that you don't care if you
      go to prison or on [sic] for all these crimes or
      not?

A:    I am not saying that.

Q:    Do you . . . you do care, don't you sir?

A:    Everybody cares, but whatever has to happen is
      going to happen.  I can't change that.  I hope it
      doesn't happen, but I don't know what's going to
      happen.  All I am here is to tell the truth.

See id.  Defense counsel pursued this same line of questioning on

several other occasions.

     Defense counsel also questioned whether Ferle had

received or expected to receive payment for his testimony:

Q:    Do you expect to go into the Federal Witness
      Protection Program with a stipend or something
      every month . . . a salary?

.  .  .

A:    That really hasn't been discussed.  I am in State
      Police custody.  I haven't talked about any Federal
      programs.

Q:    Who's supporting you now?

.  .  .

> A:   I am in the custody of the Rhode Island State
>      Police.
>
> Q:   Who supports your family?
>
> . . .
>
> A:   They're also in the State Police custody.
>
> . . .
>
> Q:   Right now, you are being supported by the taxpayers
>      of the State of Rhode Island?
>
> . . .
>
> A:   I don't know that I am.   I am in State Police
>      custody.

Id. (alterations in original) (internal quotation marks omitted).

On June 7, 1984, a jury convicted DeCiantis of murder in the first degree.  Id. at 559.

B.        The Prosecution's Disclosures to DeCiantis

We describe how the Brady issue arose, although the outcome of this petition does not turn on the fact of non-disclosure.

In 2005 and 2006, the Providence Superior Court, on DeCiantis's application for postconviction relief, heard testimony from the prosecutor in DeCiantis's murder trial, David Leach, id. at 562, and from a lieutenant with the state police who had been involved in "handling" Ferle as a witness, Michael Urso, id. at 566.  DeCiantis's trial counsel had died before the hearing.  Id. at 568.

1.     <u>Disclosures Concerning Ferle's Criminal History</u>

Prosecutor Leach testified that Ferle's Bureau of Criminal Identification (BCI) record had been disclosed to DeCiantis in February 1984, before his trial, but that this record omitted offenses with which DeCiantis had not been charged at that time. <u>Id.</u> at 563. Leach did not know whether he had disclosed to DeCiantis any other information about Ferle's criminal history. <u>Id.</u>

DeCiantis's counsel had cross-examined Ferle about crimes that were not listed in the BCI record, <u>id.</u>, such as the pending murder charge and robbery charge, <u>id.</u> at 565.

Leach conceded that the prosecution, in a case concerning a different defendant, Nicholas Bianco, had submitted a September 12, 1984 supplemental answer which listed many more crimes in which Ferle had been involved than those about which Ferle had been cross-examined at DeCiantis's trial. <u>Id.</u> at 564. That supplemental answer stated that "[d]uring the course of the de-briefing of William Ferle, he has indicated his involvement in the following criminal activity," <u>id.</u> (alteration in original) (internal quotation marks omitted); it then listed twenty-four crimes, including eleven arsons, nine robberies, one larceny, two murders, and one conspiracy to murder.[1] Indictments had been

---

[1] The supplemental answer listed the robbery and arson, but not the murder or the offense of obtaining money under false pretenses, about which Ferle was cross-examined at DeCiantis's

issued by a grand jury for six of these crimes and Ferle was a defendant in four of these cases. Id. Two crimes were the subject of continuing grand jury investigations, and Ferle was a potential defendant in four other cases. Id.

Leach stated that he "assume[d]" that the state had not learned of these crimes immediately before the Bianco trial, but that he did not recall when these incidents came to the attention of the state police. Id. at 564-65. However, Urso testified that while he could not indicate in which month Ferle admitted all the crimes in which he had been involved, it was "very possible" that Ferle had disclosed all these crimes by June of 1984. Id. at 566 (internal quotation marks omitted).

Neither the Superior Court nor the R.I. Supreme Court made a specific finding as to which of Ferle's criminal activities were known to those acting on the prosecution's behalf but not disclosed to DeCiantis before his conviction. The Superior Court appeared to assume, arguendo, that the state withheld evidence before trial as to a murder admitted by Ferle. DeCiantis II, slip op. at 9.

As said, the R.I. Supreme Court determined that "evidence of additional criminal activity on the part of Mr. Ferle" was not material. It did not identify what evidence it was considering. DeCiantis III, 24 A.3d at 573.

---

trial.

## 2. Disclosures Concerning Ferle's Compensation

In a signed but undated memorandum of agreement between Ferle, the R.I. Attorney General's Office, and the R.I. State Police, Ferle acknowledged that while in the custody of the state police, he had received almost $24,000 "for his support in a 'safe' house and for the support of his wife and child." Id. at 565 (internal quotation marks omitted). Leach did not believe that these amounts were disclosed to DeCiantis. Id. Urso further testified that the state police had made mortgage payments for Ferle until his house was sold. Id. at 567. Leach nonetheless confirmed that in a document dated May 21, 1984, the state indicated in an answer to DeCiantis's motion for favorable evidence that "[n]o promises, rewards or inducements, other than personal safety and the safety of his family have been made to William R. Ferle." Id. at 566 (alteration in original) (internal quotation marks omitted).

## II.

DeCiantis's 1998 state postconviction relief petition had two claims: that "the State withheld information regarding the specific promises, rewards and inducements made to witness William Ferle," and "the State intentionally withheld an uncharged act[2] -- the murder of Ronald McElroy -- admitted by [Mr.] Ferle prior to

---

[2] In DeCiantis's postconviction memorandum, he asserted that the state had actually withheld eleven of Ferle's crimes.

-10-

trial." DeCiantis IV, 868 F. Supp. 2d at 2 (second alteration in original) (internal quotation marks omitted). As to the first argument, the Superior Court concluded that "there is no reasonable probability of a different result had the Petitioner been provided with the specific expenditures made on Ferle at the time of trial." DeCiantis II, slip op. at 9. As to the second argument, the Superior Court determined that "there exists no authority to support the Petitioner's proposition that the State is obligated to inform opposing counsel of underlined admissions of a witness," id., and that "the addition of an immaterial uncharged admission creates no reasonable probability of a different result," id. at 10.

On appeal, DeCiantis argued that the Superior Court erred in finding that the state had not deliberately withheld evidence favorable to him, and hence failed to give him the benefit of Rhode Island law regarding deliberate nondisclosure.[3] The R.I. Supreme Court upheld the Superior Court's determination that there had been no deliberate failure to disclose evidence favorable to DeCiantis, DeCiantis III, 24 A.3d at 571-72, but rejected its conclusion that DeCiantis was not entitled to disclosure of Ferle's uncharged acts, id. at 572-73. Nonetheless, the court concluded that DeCiantis had

---

[3] Under Rhode Island law, the deliberate nondisclosure of evidence favorable to a defendant furnishes "grounds for a new trial regardless of the degree of harm to the defendant." State v. Chalk, 816 A.2d 413, 419 (R.I. 2002). This standard "'provides even greater protection to criminal defendants than the one articulated [by the United States Supreme Court].'" Id. (quoting Cronan ex rel. State v. Cronan, 774 A.2d 866, 880 (R.I. 2001)).

not satisfied his burden of showing that the undisclosed evidence was material and affirmed the denial of his application.  Id. at 573.

In DeCiantis's § 2254 federal court petition, he asserted that (1) "the Rhode Island Supreme Court erred in affirming the post conviction judge's finding that the state did not deliberately withhold exculpatory evidence from the defendant, in violation of his Fifth Amendment rights"; and (2) "the Rhode Island Supreme Court erred when it found that if the state's failure to disclose exculpatory evidence was not deliberate there was no constitutional violation because the evidence was not material."  The district court rejected[4] the first argument on the basis that the "'good faith or bad faith of the prosecution'" in failing to disclose favorable evidence is irrelevant under clearly established U.S. Supreme Court law.  DeCiantis V, 2012 WL 5287036, at *2 (quoting Brady, 373 U.S. at 87).  The court concluded that the R.I. Supreme Court's decision concerning the materiality of any undisclosed evidence was neither "contrary to" nor an "unreasonable application of" clearly established U.S. Supreme Court law, DeCiantis IV, 868 F. Supp. 2d at 5-6, and denied DeCiantis's petition, DeCiantis V, 2012 WL 5287036, at *2.  We agree.

---

[4] The district court preliminarily determined that DeCiantis's habeas petition had been timely filed, DeCiantis IV, 868 F. Supp. 2d at 3-4, a conclusion that is not at issue on appeal.

III.

We review a district court's grant or denial of habeas relief de novo, meaning that "the district court opinion, while helpful for its reasoning, is entitled to no deference." Healy, 453 F.3d at 25. DeCiantis repeats his argument that the state high court decision was both contrary to and involved an unreasonable application of clearly established U.S. Supreme Court law.[5] He focuses on the state court's determination regarding the third component of a Brady violation. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

_____

[5] 28 U.S.C. § 2254(d) provides that

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A.        Did the R.I. Supreme Court Use a Materiality Standard That Was Contrary to Clearly Established U.S. Supreme Court Law?

The U.S. Supreme Court has held that "[u]nder the 'contrary to' clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). DeCiantis argues that the R.I. Supreme Court applied the wrong materiality standard to his claims that the state withheld favorable evidence. It did not.

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)).

The R.I. Supreme Court twice stated the correct standard that evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" DeCiantis III, 24 A.3d at 571, 573 (quoting Chalk, 816 A.2d at 419) (emphasis omitted). It noted that the Superior Court, in denying DeCiantis's

-14-

application, had held that "there is no reasonable probability of a different result had the [applicant] been provided with the specific expenditures made on Ferle at the time of trial," and that "the addition of an immaterial uncharged admission creates no reasonable probability of a different result." Id. at 568-69 (alteration in original) (quoting DeCiantis II, slip op. at 9-10) (internal quotation marks omitted).

DeCiantis's argument is based on the fact that the court also stated, in a variation, that "[w]e are unpersuaded that evidence of additional criminal activity on the part of Mr. Ferle would have materially changed the jury's evaluation of him as a witness or would have changed the ultimate result of the proceeding." Id. at 573 (emphasis added).

The R.I. Supreme Court did not "arrive[] at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law." Williams, 529 U.S. at 413. It twice enunciated the correct standard and twice noted the Superior Court's application of the correct standard. The court also twice stated that DeCiantis had not met his burden as to materiality.[6]

Notwithstanding the court's one-time use of an abbreviated expression of the materiality standard under Brady, its decision was not "contrary to . . . clearly established Federal

---

[6] It first stated this conclusion in a sentence that immediately followed an unquestionably correct recitation of the materiality standard under Brady. DeCiantis III, 24 A.3d at 573.

-15-

law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).

B.        Was The R.I. Supreme Court's Application of the Materiality Standard an Unreasonable Application of Clearly Established U.S. Supreme Court Law?

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  This is a tough standard.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."[7]  Id. at 411.  DeCiantis argues that "the newly discovered evidence was so overwhelmingly impeaching that the Rhode

---

[7] This court has noted the "unreasonable application of prong of § 2254(d)(1) reduces to a question of whether the state court's derivation of a case-specific rule from the [Supreme] Court's generally relevant jurisprudence appears objectively reasonable." O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (alteration in original) (quoting Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001)) (internal quotation marks omitted).  "For example, the state court decision may be unreasonable if it is devoid of record support for its conclusions or is arbitrary."  McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002).  "The increment [of the state court's incorrectness] need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  Morgan v. Dickhaut, 677 F.3d 39, 46-47 (1st Cir. 2012) (quoting O'Laughlin, 568 F.3d at 299) (internal quotation marks omitted).

-16-

Island Supreme Court's decision to the contrary was unreasonable, not just merely incorrect."[8]

The R.I. Supreme Court reasoned that at DeCiantis's trial, "Ferle was confronted with his prior conviction of conspiracy and bank fraud, as well as pending charges of obtaining money under false pretenses, robbery, arson, and even murder," and that "Ferle was questioned repeatedly with respect to what he hoped to obtain in return for his testimony." DeCiantis III, 24 A.3d at 573. It also noted that Ferle was "questioned explicitly as to whether or not he was receiving monetary support from the state or from the police." Id.

While the court did not make a finding as to which items of favorable evidence pointed to by DeCiantis were withheld by the prosecution, the court's conclusion was not unreasonable. The jury did learn Ferle was facing charges of robbery, arson, murder, and obtaining money under false pretenses, and that he and his family were in the custody of the state police. Ferle frankly admitted that he hoped for more lenient sentences on the charges pending against him, as well as state police protection, in exchange for his testimony, and DeCiantis's counsel focused at length on these

---

[8] DeCiantis further asserts that "there is clearly a distinction between 'actual probability' and 'reasonable probability,'" and that under a "reasonable probability" standard his "murder conviction was not a verdict worthy of confidence." As said, the R.I. Supreme Court actually applied a "reasonable probability" standard, and it did not do so unreasonably.

incentives in cross-examination.  Ferle was extensively impeached at DeCiantis's trial, and disclosure of evidence that Ferle had participated in more crimes, and had received specific payments from the state police, would not have produced a reasonable probability that "the result of the proceeding would have been different."  Bagley, 473 U.S. at 682 (opinion of Blackmun, J.). Even if we assume this evidence would have induced the jury to view Ferle differently, there was still the testimony of the other witnesses at trial, who overwhelmingly pegged DeCiantis, through his own statements and other evidence, for Roche's murder.

## IV.

The judgment of the district court is affirmed.  So ordered.